**Robin CLIFTON and Maine Right to Life Committee, Plaintiffs,**

**v.**

**FEDERAL ELECTION COMMISSION, Defendant.**

**Civil No. 96–66–P–H.**

United States District Court, D. Maine.

May 20, 1996.

Daniel M. Snow, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, James Bopp, Jr., Paul R. Scholle, Bopp, Coleson & Bostrom, Terre Haute, IN, for plaintiffs.

Steven Hershkowitz, Lawrence M. Noble, Richard B. Bader, Robert J. Bonham, Federal Election Commission, Washington, DC, for defendant.

## MEMORANDUM DECISION

HORNBY, District Judge.

This is the third lawsuit brought by the Maine Right to Life Committee ("MRLC") against the Federal Election Commission ("FEC"). The other plaintiff is Robin Clifton, not a member of the MRLC, but an individual who receives and reads their publications. This time the MRLC challenges the FEC's new regulations (effective March 13, 1996) restricting contact or coordination between a corporation and a candidate when the corporation publishes candidate voting records or voter guides. 11 C.F.R. § 114.4(c)(4) & (5). In light of the upcoming June primary, the case has been expedited, the motions for temporary and preliminary injunctive relief have been consolidated into the hearing on the merits and the case is submitted on a stipulated record. The plaintiffs have now waived their initial request for injunctive relief because of the early availability of declaratory relief. I heard oral argument on May 10, 1996, and received supplemental briefs on May 15, 1996. These are my findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52.

### FACTS

The material facts about the MRLC have not changed appreciably since my decisions in *Faucher v. FEC*, 743 F.Supp. 64 (D.Me. 1990), and *Maine Right to Life Committee v. FEC*, 914 F.Supp. 8 (D.Me.1996) ("*MRLC*"). The MRLC is a nonprofit membership corporation exempt from federal income tax under Internal Revenue Code § 501(c)(4). It has approximately 2,000 members. The MRLC engages in various educational, social action and political activities in order to further its stated goals of "restoring protection to the right to life for unborn children, educating the public on the issue of abortion and promoting the sanctity of all innocent life." *See* Stipulation of Facts ¶ 5. It accepts donations from business corporations into its general fund. From that fund it publishes quarterly newsletters, voter guides and congressional voting records on pro-life issues. (MRLC also operates a separate segregated fund pursuant to 2 U.S.C. § 441b(2)(C), the activities of which are not involved in this challenge.)

In *Faucher*, I set forth the basis for my authority to review a challenge to the legality of FEC regulations under the Administrative Procedure Act, 5 U.S.C. § 706(2)(C). 743 F.Supp. at 67–68. In *MRLC*, I set forth the reasons why the MRLC need not obtain an advisory opinion from the FEC before seeking declaratory relief and explained the deference ordinarily to be accorded FEC interpretations unless the United States Supreme Court has spoken. 914 F.Supp. at 10, 12–13. Those previous analyses apply here and need not be repeated. I turn therefore to the merits.

### THE DISPUTE

The controversy here involves corporate publication of voting records and voter guides. The regulations in question[1] impose

---

1. The relevant subsections read:

(4) Voting records. A corporation or labor organization may prepare and distribute to the general public the voting records of Members of Congress, provided that the voting record and all communications distributed with it do ·not expressly advocate the election or defeat of any clearly identified candidate, clearly identified group of candidates or candidates of a clearly identified political party. The decision on content and the distribution of voting records shall not be coordinated with any candidate, group of candidates or political party.

(5) Voter guides. A corporation or labor organization may prepare and distribute to the general public voter guides consisting of two or more candidates' positions on campaign issues, including voter guides obtained from a nonprofit organization which is described in 26 U.S.C. 501(c)(3) or (c)(4), provided that the voter guides comply with either paragraph (c)(5)(i) or (c)(5)(ii)(A) through (E) of this section. The sponsor may include in the voter guide biographical information on each candidate, such as education, employment positions, offices held, and community involvement.

(i) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, and no portion of the voter guide may expressly advocate the election or defeat of one or more clearly identified candidate(s) or candidates of any clearly identified political party.

(ii)(A) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation

explicit restrictions on the publication of voting records and voter guides by corporations and labor unions.

Specifically, for publication of voting records, not only is express advocacy of the election or defeat of a clearly identified candidate or candidates forbidden (both sides agree that this is consistent with *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*"MCFL"*), but in addition the FEC demands that even in the absence of such express advocacy "[t]he decision on content and the distribution of voting records shall not be coordinated with any candidate, group of candidates or political party." 11 C.F.R. § 114.4(c)(4). The term "coordinated" is undefined.

The constraints on voter guide preparation are more severe. In addition to the acceptable prohibition of express advocacy of election or defeat of a clearly identified candidate or candidates, the FEC requires a corporation or union publishing a voter guide without any such advocacy to make a choice nevertheless: either (1) have no contact at all with any candidate or committee in preparing the guide—in that event the only other restriction is that at least two candidates be covered in the guide, 11 C.F.R. § 114.4(c)(5)(i); or (2) have contact, but only through written questions and written responses—in that event the voter guide must give each candidate the same prominence and substantially the same space for response, must contain no "electioneering message" (undefined but apparently not the

same as "express advocacy," *see FEC v. Colorado Republican Fed. Campaign Comm.*, 59 F.3d 1015, 1023 n. 10 (10th Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 689, 133 L.Ed.2d 594 (1996)), and must not score or rate the candidates' responses "in such a way as to convey an electioneering message." 11 C.F.R. § 114.4(c)(5)(ii)(A), (C)–(E).

The MRLC is unwilling to submit to these restrictions, except for the prohibition on express advocacy of the election or defeat of a clearly identified candidate. The MRLC publishes voting records and voter guides from time to time with funds from its general treasury and wishes to do so in connection with Maine's upcoming June primary election. It wants, for example, to be able to contact a candidate or campaign office directly and orally seek explanation of particular votes or statements and, if it chooses to communicate in writing, not be limited by the space, prominence and other relevant regulatory requirements. It maintains that the new restrictions exceed the FEC's statutory power as construed by the United States Supreme Court and that the very existence of these restrictions chills the MRLC's exercise of its First Amendment rights.

The FEC contends that its new regulations are within its power. The FEC finds authorization for its regulations in the Federal Election Campaign Act of 1971 ("FECA"), prohibiting "any corporation whatever" from making "a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative ... are to be voted for, or in connection with any primary

with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, except that questions may be directed in writing to the candidates included in the voter guide and the candidates may respond in writing;
(B) All of the candidates for a particular seat or office shall be provided an *equal opportunity* to respond, except that in the case of Presidential and Vice Presidential candidates the corporation or labor organization may choose to direct the questions only to those candidates who—
(1) Are seeking the nomination of particular political party in a contested primary election; or

(2) Appear on the general election ballot in the state(s) where the voter guide is distributed or appear on the general election ballot in enough states to win a majority of the electoral votes;
(C) No candidate may receive greater prominence in the voter guide other than participating candidates, or substantially more space for responses;
(D) The voter guide and its accompanying materials shall not contain an electioneering message; and
(E) The voter guide and its accompanying materials shall not score or rate the candidates' responses in such a way as to convey an electioneering message.
11 C.F.R. § 114.4(c)(4) & (5).

election ... held to select candidates for any of the foregoing offices...." 2 U.S.C. § 441b(a). Publication of the voting records and voter guides will concededly require the spending of money by the MRLC.

I observed in *MRLC* that because of the First Amendment the United States Supreme Court explicitly has narrowed FECA's very broad prohibition against corporate election-related spending to a prohibition on spending involving express advocacy of the election or defeat of a clearly identified candidate or candidates. 914 F.Supp. at 9; *see MCFL*, 479 U.S. at 249, 107 S.Ct. at 623, 93 L.Ed.2d at 551; *see also Buckley*, 424 U.S. at 80, 96 S.Ct. at 663, 46 L.Ed.2d at 723. The Court has ruled that spending for issue advocacy, on the other hand, cannot be stopped. *See MCFL, id.* This distinction between issue advocacy and express advocacy of the election or defeat of a clearly identified candidate or candidates has been a continuing source of dissension between the MRLC and the FEC.

This case, however, presents a new twist. In *MCFL*, the Supreme Court struck down *expenditure* limitations except in cases of express advocacy but, as it had done in *Buckley*, generally approved the limits imposed on *contributions* to candidates. 479 U.S. at 259–60, 107 S.Ct. at 628–29, 93 L.Ed.2d at 557–58. The FEC argues that its new regulations are designed to deal with corporate expenditures that have been coordinated with the candidates or their campaign offices and that such coordination makes them "contributions" not subject to the First Amendment concerns of *Buckley* and *MCFL*. 60 Fed. Reg. 64,260, 64,260 (Dec. 14, 1995) ("New language has been added to 11 CFR 114.2, 114.3 and 114.4 to address the question of when coordination between a candidate and a corporation or labor organization will cause an activity to become a prohibited contribution.")[2] Indeed, at oral argument, the FEC's counsel asserted that the new regulations are defended only on the ground that the activity in question can properly be interpreted as a contribution, not an expenditure. The MRLC disagrees with this "contribu-

tion" characterization and argues that this is just one more attempt by the FEC to avoid the *Buckley* and *MCFL* holdings that restricted its authority over issue advocacy.

**ANALYSIS**

■■■ Contributions to a candidate from a corporation's or union's general treasury funds can constitutionally be prohibited. That much is straightforward, for the governmental interests in preventing corruption or the appearance of corruption outweigh the First Amendment interests at stake. *Buckley,* 424 U.S. at 47, 96 S.Ct. at 648, 46 L.Ed.2d at 704; *MCFL,* 479 U.S. at 260, 107 S.Ct. at 629, 93 L.Ed.2d at 557–58; *FEC v. National Conservative Political Action Comm.,* 470 U.S. 480, 496–98, 105 S.Ct. 1459, 1468–69, 84 L.Ed.2d 455, 469–70 (1985) ("*NCPAC*"). It is equally clear after *Buckley* and *MCFL* that corporate expenditures in connection with a federal election or primary *cannot* constitutionally be limited except when they are devoted to express advocacy of the election or defeat of a particular candidate or candidates. *Faucher v. FEC,* 928 F.2d 468, 470 (1st Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *see also MRLC,* 914 F.Supp. at 9. In other words, spending on issue advocacy—the only form of advocacy the Maine Right to Life Committee proposes to engage in here—cannot be limited. *Id.* The question is, what happens when a corporation preparing to publish a voting record or a voter guide as a form of issue advocacy contacts the candidate for information or other purposes? Does the publication then become a prohibited contribution?

■■■ In one section of the legislation, the FECA sets dollar limits on the amount of contributions, but does not prohibit them outright. 2 U.S.C. § 441a(a). For the purposes of these contribution limits, "contribution" is defined to include "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents," 2 U.S.C. § 441a(a)(7)(B)(i)—language that, the FEC

---

**2.** The FEC's justification for these new rules is best presented in its own "Explanation and Justi-

fication," which I have excerpted and attached. *See* Appendix.

argues, furnishes authority for what it has done here in the new regulation. Def.'s Mem. of Points and Authorities at 14 n. 7; Reply to Pls.' Opp. at 5. That expansive definition for dollar-limited contributions, however, is explicitly limited by its terms to section 441a. 2 U.S.C. § 441a(a)(7).

A separate provision, section 441b, prohibits corporate and union contributions and expenditures altogether for presidential and congressional elections and primaries. It is the section upon which the new FEC regulations are based and it results from a long history of legislative enactments and amendments recounted by the Supreme Court in *FEC v. National Right to Work Comm.*, 459 U.S. 197, 208–09, 103 S.Ct. 552, 559–60, 74 L.Ed.2d 364, 375–77 (1982); *Pipefitters v. United States*, 407 U.S. 385, 402–12, 92 S.Ct. 2247, 2257–63, 33 L.Ed.2d 11, 23–29 (1972); and *United States v. International Union (UAW–CIO)*, 352 U.S. 567, 570–87, 77 S.Ct. 529, 531–39, 1 L.Ed.2d 563, 566–75 (1957).[3] Section 441b has its own separate definition of the terms in question: "For purposes of this section ... the term 'contribution or expenditure' shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value ... to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to...." 2 U.S.C. § 441b(b)(2). The United States Supreme Court in *MCFL* went beyond that definition contained in section 441b and looked as well to the general definitions section of the FECA, which includes under "expenditure" "the provision of anything of value made 'for the purpose of influencing any election for Federal office....'" 479 U.S. at 245–46, 107 S.Ct. at 621, 93 L.Ed.2d at 548 (quoting 2 U.S.C. § 431(9)(A)(i)). As a result, the Court concluded that "441b was meant to proscribe expenditures in connection with an election" even if the payments are not made directly to candidates or campaign organizations, 479

U.S. at 246, 107 S.Ct. at 622, 93 L.Ed.2d at 549, so long as they are made "on behalf of candidates." 479 U.S. at 248, 107 S.Ct. at 623, 93 L.Ed.2d at 550. That is the statutory and interpretive language on which the FEC's new regulations must be based.[4]

The new regulations go far beyond the language of section 441b as interpreted by *MCFL*. 479 U.S. at 248, 107 S.Ct. at 623, 93 L.Ed.2d. at 550. Under the provisions for voter guides, the FEC test is not whether a corporation is engaging in issue advocacy "on behalf of" a candidate (a test *MCFL* would support), but whether it has had any "contact" with the candidate. The regulations permit unrestricted issue advocacy only if there is *no* contact, oral or written, with any candidate in connection with the voter guide. 11 C.F.R. § 114.4(c)(5)(i). Any oral contact concerning the content of a voter guide—questions to clarify a candidate's position, for example—results in outright prohibition of corporate issue advocacy through use of the guide. *Id.* § 114.4(c)(5). Even written contact with candidates results in severe constraints on issue advocacy, *id.* § 114.4(c)(5)(ii), otherwise entitled to broad First Amendment protection under the teachings of *Buckley* and *MCFL*.

The voting record regulation comes closer to being within the FEC's authority because it states only that "[t]he decision on content and the distribution of voting records shall not be coordinated with any candidate...." 11 C.F.R. § 114.4(c)(4). Coordination of *spending on behalf of* a candidate is within *MCFL*'s interpretation of the scope of the 441b prohibition. But when it comes to voting records, what is coordination of a decision on content? A commonly used dictionary defines "coordinate" as "to combine in harmonious relation or action." *The Random House Unabridged Dictionary* 447 (2d ed. 1993). Does that prohibit discussion with the candidate of what a particular vote meant and a summary of the outcome in the pub-

---

**3.** Difficulties with the distinction between contributions and expenditures for 441b have been apparent at least since 1944. *See International Union (UAW–CIO)*, 352 U.S. at 579–84, 77 S.Ct. at 535–37, 1 L.Ed.2d at 571–74.

**4.** This language also differs from that now before the Supreme Court in *FEC v. Colorado Republican Fed. Campaign Comm.*, 59 F.3d 1015, *cert. granted,* —— U.S. ——, 116 S.Ct. 689, 133 L.Ed.2d 594 (1996) (construing 2 U.S.C. § 441a(d)(3)).

lished voting record? If there are three apparently inconsistent votes and the MRLC asks the candidate for an explanation and summarizes the explanation in the publication, is that prohibited coordination of a decision on content? These are exactly the types of issue advocacy undertaken by the MRLC and, as I understand the FEC's counsel's oral argument, such activities are indeed prohibited by the new regulations. But it is a distortion of the English language to say that they turn the MRLC's publication of the voter guide into spending "on behalf of" a candidate.

The FEC tries to find support for its contribution argument in language it extracts from *Buckley, NCPAC* and *MCFL* distinguishing independent expenditures from coordinated expenditures. In *Buckley,* for example, the Court dealt with FECA's expenditure limitations that took at least two forms: limitations on candidates or candidate organizations directly and limitations on other persons advocating for or against a candidate. *See* 424 U.S. at 187–95 app., 96 S.Ct. at 713–16, 46 L.Ed.2d at 782–87. The Court referred to the latter as "independent expenditures." 424 U.S. at 22, 45, 46–47 n. 53, 51, 96 S.Ct. at 636, 647, 648, 650, 46 L.Ed.2d at 689, 702, 703, 706. When confronted with the argument that these expenditures could be coordinated with a candidate (*e.g.,* a third party paying for media advertisements) so as to provide virtually the same value as a prohibited contribution, the Court pointed out that the same section of the Act defined expenditures "authorized or requested by the candidate" as prohibited contributions, 424 U.S. at 46–47 n. 53, 80, 96 S.Ct. at 648, 664, 46 L.Ed.2d at 703, 722–23, and characterized this category as covering "all expenditures placed in cooperation with or with the consent of a candidate...." 424 U.S. at 78, 96 S.Ct. at 663, 46 L.Ed.2d at 721. The Court also sustained a separate $500 statutory limit on volunteers' individual expenses in contributing goods or services to a candidate. 424 U.S. at 36–37, 96 S.Ct. at 643, 46 L.Ed.2d at 697. The FEC argues that *Buckley* thereby permits it to prohibit expenditures unless they are completely "independent" of any

candidate or committee. But unlike the provisions discussed in *Buckley,* there is no language in the statutory provisions relating to section 441b's prohibition on corporate or union contributions that would support what the FEC has done.

The word "independent" did seem to gain more importance in *NCPAC.* There, the Court referred to expenditures as " 'independent' in that they were not made at the request of or in coordination with the official Reagan election campaign committee or any of its agents," 470 U.S. at 490, 105 S.Ct. at 1465, 84 L.Ed.2d at 465, and referred to *Buckley* as striking down the limitation on "individuals' independent expenditures because we found no tendency in such expenditures, *uncoordinated with the candidate or his campaign,* to corrupt or to give the appearance of corruption." 470 U.S. at 497, 105 S.Ct. at 1468, 84 L.Ed.2d at 469–70 (emphasis added). Once again, however, the Court noted that coordinated expenditures were treated as contributions by specific statutory language, this time the language being that quoted above from section 441a— language specifically not applicable to the corporate contributions or expenditures here. 470 U.S. at 492, 105 S.Ct. at 1466, 84 L.Ed.2d at 466–67.

Finally, in *MCFL,* the Court again referred to "independent" spending or expenditures, but this time did not specify the particular sense in which it was using the term. *See, e.g.,* 479 U.S. at 241, 249, 251, 260, 262, 107 S.Ct. at 619, 623, 624, 629, 630, 93 L.Ed.2d at 546, 551, 552, 558, 559.

Thus, the FEC has taken the Supreme Court's discussion of statutory language that specifically does not apply here and has used it to conclude that the First Amendment does not foreclose its new regulations. What that Supreme Court language did, however, was approve what Congress had done in other portions of FECA, not give that authority independently to the FEC. The FEC has neglected to find appropriate statutory authority for what it has done in interpreting section 441b.[5]

---

5. Contrary to the FEC's claim, *see* Defendant's Letter Brief at 2–3, the fact that FECA has de-

fined "independent expenditure," 2 U.S.C. § 431(17), does not shed light on when an expen-

Even if I were to accept the FEC's argument that *Buckley*'s discussion of the statutory language concerning coordination of individuals' spending and the limits on volunteers' expenses could be used to interpret the language of section 441b, *Buckley* talked only about prohibiting expenditures "authorized or requested by the candidate," interpreted at its broadest as "all expenditures placed in cooperation with or with the consent of a candidate." 424 U.S. at 46–47 n. 53, 96 S.Ct. at 648, 46 L.Ed.2d at 703. (*NCPAC* and *MCFL* are no different in this respect. *See* 470 U.S. at 498, 105 S.Ct. at 1469, 84 L.Ed.2d at 470; 479 U.S. at 248, 107 S.Ct. at 623, 93 L.Ed.2d at 550.) The FEC has gone far beyond "cooperation" or "consent" in these prohibitions of all contact and consultation in the preparation of voter guides and the broad prohibition of content coordination for voting records.[6]

The FEC fundamentally has misinterpreted the Supreme Court's teachings. *Buckley* approved contribution limits because, "[b]y contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." 424 U.S. at 20, 96 S.Ct. at 635, 46 L.Ed.2d at 688–89. The basis for this conclusion, as the Court took pains to point out, is that a contribution of money *to* a candidate is not direct communication but only an "undifferentiated, symbolic act." 424 U.S. at 21, 96 S.Ct. at 635, 46 L.Ed.2d at 689. Specifically, "[w]hile contributions may *result* in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions

into political debate involves *speech by someone other than the contributor.*" 424 U.S. at 21, 96 S.Ct. at 636, 46 L.Ed.2d at 689 (emphases added). But that specifically is not the type of spending, call it expenditure or contribution, at stake here in the MRLC's publication of voting records and voter guides. These publications are the MRLC's direct issue advocacy, not the candidate's. Nor is it the mere third-party billpaying for a candidate's media advertisements or a volunteer's incidental expenses that *Buckley* was talking about when it treated coordinated spending as a contribution under different statutory language. 424 U.S. at 46–47 n. 53, 96 S.Ct. at 647–48, 46 L.Ed.2d at 703. Here, both the disbursements and the speech are *direct political speech by the MRLC,* not by the candidate. They are thus at the heart of the Court's First Amendment concerns. *See* 424 U.S. at 14–23, 96 S.Ct. at 632–36, 46 L.Ed.2d at 684–90; *see also NCPAC,* 470 U.S. at 495–96, 105 S.Ct. at 1468, 84 L.Ed.2d at 469 ("[A] corporation's expenditures to propagate its views on issues of general public interest are of a different constitutional stature than corporate contributions to candidates.").

Thus, there is no authority for the FEC's new regulations on voting records and voter guides. The statute itself (section 441b) does not make corporate expenditures, occurring after contact with a candidate, into contributions. *MCFL* broadens the statutory definition somewhat to treat expenditures made "on behalf of" a candidate as within the statute, 479 U.S. at 248, 107 S.Ct. at 623, 93 L.Ed.2d at 550, but that still is a far cry from what the FEC has prohibited here. And the Supreme Court's First Amendment concerns

---

diture for issue advocacy can be treated as a contribution to a candidate. By definition the term "independent expenditure" is limited to express advocacy—"an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate . . .," *id.*—unlike the issue advocacy at stake here. Moreover, the term is not used to approve or prohibit spending, but only for reporting requirements, 2 U.S.C. § 434.

**6.** Likewise, even if section 441a's definition of "contribution" were relevant, the legislative history indicates that the definition was intended to distinguish "between independent expression of

an individual's views and the use of an individual's resources to aid a candidate in a manner *indistinguishable in substance from the direct payment of cash to a candidate.*" S.Rep. No. 677, 94th Cong., 2d Sess. 31, 59 (1976), *reprinted in* 1976 U.S.C.C.A.N. 946, 974 (emphasis added). The regulations challenged here prohibit activities far beyond that which could be understood as a de facto payment of cash (*i.e.*, as asserted by the FEC's counsel at the hearing, even telephone calls to clarify the accuracy of a candidate's position for report in a voter guide fall within the literal prohibition).

run counter to the FEC's new prohibitions. I am sympathetic to the argument that enforcement is more difficult if the FEC cannot prohibit all oral communications and make enforcement decisions on simple criteria easily applied to written questions and answers, but as long as the Supreme Court holds that expenditures for issue advocacy have broad First Amendment protection, the FEC cannot use the mere act of communication between a corporation and a candidate to turn a protected expenditure for issue advocacy into an unprotected contribution to the candidate.[7]

In an effort to uphold the regulations, I have considered two other ways in which they might survive. First, the FEC could have advanced the regulations only as safe-harbor provisions. In other words, any corporation or labor union that satisfied the conditions of subsections 114.4(c)(4) or (5), as the case may be, could have been guaranteed that it was in compliance, while all others would have faced the more ambiguous language of the statute and the caselaw as to when spending becomes a contribution instead of an expenditure. The MRLC then would have no legitimate challenge, because all it seeks is the right to be judged under the statute and caselaw in any event. But the FEC's counsel expressly disclaimed this interpretation at oral argument and the FEC's "Explanation and Justification" also make clear that it is not the FEC's intent. 60 Fed.Reg. at 64,263, 64,269; *see* Appendix.

Second, the regulatory phrases that instruct a corporation not to "coordinate[ ]," 11 C.F.R. § 114.4(c)(4), or "contact or in any other way act in cooperation, coordination, or consultation with . . .," *id.*, § 114.4(c)(5)(i) & (ii), a candidate about the publications could have been given a narrowing construction that would have limited them to activity equivalent to actions "on behalf of" a candidate, consistent with *MCFL*. 479 U.S. at 248, 107 S.Ct. at 623, 93 L.Ed.2d at 550. It is clear, however, from the FEC's "Explanation and Justification" and its counsel's written and oral argument that such is not the FEC's position. *See, e.g.,* Reply to Pl.s' Opp.

at 2–3 (stating that even information requests must, "as a prophylactic measure," be in writing); 60 Fed.Reg. at 64,267, 64,269. Instead, the FEC's purpose is to establish a bright-line test measured by the plain language of these terms in all their breadth. Without narrowing, the regulations are beyond the FEC's authority.

Accordingly, the plaintiffs' request for declaratory judgment is GRANTED as follows: It is hereby ADJUDGED that the regulations found at 11 C.F.R. § 114.4(c)(4) & (5) are invalid as not authorized by the Federal Election Campaign Act of 1971, 2 U.S.C. § 431 *et seq.,* as interpreted by the United States Supreme Court in *MCFL,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539, and by the United States Court of Appeals for the First Circuit in *Faucher,* 928 F.2d 468, because they restrict issue advocacy in connection with expenditures. The Clerk shall enter judgment accordingly.

So ORDERED.

### APPENDIX

The FEC's "Explanation and Justification" for its new rules are as follows:

The revised regulations in 11 CFR 114.1(a)(1) and (a)(2) recognize that the *MCFL* decision necessitates certain distinctions between the terms "contribution" and "expenditure." The previous rules had treated these terms as coextensive. The distinction arises because the Court read an express advocacy standard into the 2 U.S.C. 441b definition of expenditure. However, payments which are coordinated with candidates constitute expenditures and in-kind contributions to those candidates even if the communications do not contain express advocacy. *See* AO 1988–22.

One commentator urged the Commission to continue to interpret the term "contribution or expenditure" to cover the same disbursements. The comment argued that the *MCFL* decision applies equally to contributions and expenditures. The Commission disagrees with this interpretation

---

7. In light of my decision I do not reach the MRLC's separate argument that the phrase

"electioneering activity" in the voter guide regulation is unconstitutionally vague.

of *MCFL,* given that the case only involved the issue of whether corporate expenditures were made. In *MCFL,* the parties did not raise and the Supreme Court did not resolve, the factual question of whether corporate contributions had been made by MCFL, Inc. However, the MCFL Court reaffirmed the First Amendment distinction between independent expenditures and contributions, which was recognized in the *Buckley* opinion. In *Buckley,* the Supreme Court generally struck down the Act's limitations on independent campaign expenditures by individuals and organizations (*Buckley,* 424 U.S. at 39–51), but upheld the constitutionality of the Act's restrictions on contributions to candidates. *Id.* at 23–38. Subsequently, the Court stated in *NCPAC* that "there was a fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate to be spent on his campaign." *Federal Election Commission v. National Conservation PAC,* 470 U.S. 480, 497 (1985). Similarly, the Court indicated that "a corporation's expenditures to propagate its views on issues of general public interest are of a different constitutional stature than corporate contributions to candidates." *Id,* [sic] at 495–96. In light of this judicially-recognized distinction, the final version of section 114.1(a)(1) and (a)(2) is being modified to recognize that the terms "contribution" and "expenditure" are not coextensive.

\*    \*    \*    \*    \*    \*

For the reasons explained above, the express advocacy standard in the revised rules applies to independent expenditures, but not contributions. The prohibition against contributions made by corporations and labor organizations in connection with federal elections remains unaffected by *MCFL.* . . .

\*    \*    \*    \*    \*    \*

. . . In *Buckley v. Valeo,* the Supreme Court made a distinction between independent expenditures and contributions. The Court observed, "[u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Buckley,* 424 U.S. at 47. Thus, *Buckley* could be interpreted to prohibit all contacts with candidates. However, the NPRM [Notice of Proposed Rulemaking] recognized that it is justifiable to allow some forms of contact to preserve the previous range of permissible activity, such as sponsoring candidate appearances. The prohibition against corporate contributions was expressly reaffirmed in *MCFL.* 479 U.S. at 260. Therefore, the NPRM sought to draw a distinction between permissible contacts with candidates which are necessary to conduct these activities, and more extensive coordination that will result in in-kind contributions in some circumstances. . . .

\*    \*    \*    \*    \*    \*

[Some commenters] pointed out that this was an area not addressed by the *MCFL* decision, and that it appeared as though the Commission was trying to find a way to impose new requirements that would be at least as restrictive as the former partisan/nonpartisan standard. . . .

. . . In response to these concerns, new section 114.2(c) has been rewritten to clarify what types of contacts with candidates are considered impermissible coordination, and what types are permissible. . . . [A] corporation or labor organization that engages in election-related activities directed at the general public must avoid most forms of coordination with candidates, as this will generally result in prohibited in-kind contributions, and will compromise the independence of future communications to the general public. For example, a prohibited in-kind contribution would result if a voter guide is prepared and distributed after consulting with the candi-

date regarding his or her plans, projects or needs regarding the campaign....

\* \* \* \* \* \*

... [T]he Commission has substantially revised the concept of coordination in section 114.4. The *MCFL* decision addressed the scope of the FECA's prohibition against corporate expenditures. However, the prohibition against corporate contributions was expressly reaffirmed in *MCFL*. 479 U.S. at 260. Accordingly, the final rules which follow preserve the statutory ban on contributions made by corporations and labor organizations in connection with federal elections. Prohibited contributions include in-kind contributions resulting from the coordination of election-related corporate or union communications with candidates, except for certain activities described in this section and 11 CFR 114.3 ...

Under revised section 114.4(a), communications to the general public ... that are based on information about a candidate's plans, projects and needs provided by the candidate or the candidate's agent are considered coordinated, and hence, in-kind contributions. Such coordination may also jeopardize the independence of subsequent communications to the general public....

\* \* \* \* \* \*

5. Voting Records

\* \* \* \* \* \*

... [N]ew language has been included to indicate that the decision as to the content of a voting record also may not be coordinated with a candidate or political party....

6. Voter Guides

\* \* \* \* \* \*

... [T]he Commission has substantially revised the final rules to provide a choice of two different ways of issuing and distributing voter guides, which are intended to comport with *Faucher*....

\* \* \* \* \* \*

The first type of permissible voter guide, which is described in paragraph (c)(5)(i), is

one that is prepared and distributed without any contact, cooperation, coordination, or consultation with the candidate, the candidate's campaign or the candidates's agent. Hence, the information regarding the candidate's position on issues must be obtained from news articles, voting records, or other non-campaign sources....

The second type of permissible voter guide, which is described in paragraph (c)(5)(ii), is subject to further restrictions because it contemplates limited written contact with the candidate's campaign committee to obtain the candidate's responses to issues included in the voter guide.... The *Faucher* decision does not mandate eliminating all restrictions on voter guides save for the prohibition on express advocacy.

60 Fed.Reg. at 64,262–63, 64,267, 64,269.