No. 96-1812

ROBIN CLIFTON and MAINE RIGHT TO LIFE COMMITTEE, INC.,

Plaintiffs, Appellees,

v.

FEDERAL ELECTION COMMISSION,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]



Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.



David Kolker, with whom Lawrence M. Noble and Richard B.
Bader were on brief, for appellant.
James Bopp, Jr., with whom Paul R. Scholle, Bopp, Coleson &
Bostrom, Daniel M. Snow, and Pierce Atwood were on brief, for
appellees.


June 6, 1997


BOUDIN,  Circu it Judge. The plaintiff Maine Right to Life

Committee ("Maine Committee") brought this action in the

district  court to challenge the validity of new regulations of

the  Federal  Election Commission ("FEC"). The Maine Committee

is a nonprofit membership corporation, exempt under the

Internal Revenue Code, which engages in various activities in

opposition to abortion. It accepts donations from other

corporations for its general fund.

Among its activities thus funded is the publication of

voter guides describing the position of congressional

candidates on "pro-life" issues and the publication of

congressional voting records on the same issues. Its co-

plaintiff Robin Clifton is a recipient and reader of these

publications. The FEC regulations, effective March 13, 1996,

purport  to  regulate voter guides and voting records in several

different respects pertinent here.

Voting  records. The new FEC regulation on voting records

not only prohibits corporations and unions from expressly

advocating the election or defeat of particular identified

candidates--a  restriction not challenged by the plaintiffs--but

also provides that even without such advocacy "[t]he decision

on  content  and the distribution of voting records shall not be

coordinated with any candidate, group of candidates or

political  party." 11 C.F.R. S 114.4(c)(4). "Coordination" is

not defined.

-2- -2-

Voter guides. Along with the restriction on express

advocacy, the regulation on voter guides provides that either

a  corporation or union publishing a guide must have no contact

at  all  with  any candidate or political committee regarding the

preparation, contents and distribution of the voter guide or,

if there is such contact, (1) it must be only through written

questions and written responses, (2) each candidate must be

given  the  same  prominence and space in the guide, and (3) there

must  be  no  "electioneering message" conveyed by any scoring or

rating system used, or otherwise. 11 C.F.R. S 114.4(c)(5).

The  district  court granted a declaratory judgment holding

the regulations just described, apart from the ban on express

advocacy, "invalid as not authorized" by the Federal Election

Campaign Act of 1971, 2 U.S.C. S 431 et seq. ("the Act"),

"because they restrict issue advocacy in connection with

expenditures." Clifton v. FEC, 927 F. Supp. 493, 500 (D. Me.

1996). Some of the district court's reasoning is directed to

the  statute,  and some to a right of corporate "issue advocacy"

set  forth  in  FEC v. Massachusetts Citizens for Life, Inc., 479

U.S. 238 (1986).

We  begin  with the statute, partly because of the district

court's reliance on it and partly because of the general

precept against deciding constitutional issues unless

necessary. The provision of the Act on which the FEC relies

for authority is 2 U.S.C. S 441b. In pertinent part it

-3- -3-

prohibits  any corporation or union from making "a contribution

or  expenditure in connection with any" federal presidential or

congressional  election  or primary. The Act does permit limited

activities of this kind from "segregated" funds that are

heavily regulated and are typically known as political action

committees (PACs). See Massachusetts Citizens, 479 U.S. at

253-54.

In Massachusetts Citizens, the Supreme Court held that

section 441b prohibits corporate and union contributions but,

as  to  expenditures  other  than contributions, the Court narrowly

construed  the  statutory  ban as limited to "express advocacy" of

the election or defeat of a candidate. Id. at 249. Thus, as

glossed by the Supreme Court to avoid "overbreadth," id. at

248,  the  statute does not prevent corporations and unions from

engaging  in  issue  advocacy including publication of the records

and positions of federal election candidates.

Previously, the FEC adopted a regulation under the same

section that required voter guides to be "nonpartisan": they

could  describe the candidates' positions but could not express

the  organization's  opinion on the issues presented. This court

held  the  new  limitation to be a straightforward restriction on

issue  advocacy  and  therefore beyond the scope of the statute as

construed  by  the Supreme Court. Faucher v. FEC, 928 F.2d 468,

471 (1st Cir.), cert. denied, 502 U.S. 820 (1991).

-4- -4-

In  response  to  Faucher ,  the FEC has issued the voter guide

regulation at issue in the present case and has chosen a

different tack. Instead of claiming any direct authority to

regulate issue advocacy--a claim rejected by Massachusetts

Citizens and Faucher--the FEC defends its new regulations as

defining,  or  at least enforcing, section 441b's prohibition on

contributions . It reasons that a voting record or voter guide

publication  that fails to comply with its regulation is either

a  contribution or can be banned in the interests of preventing

prohibited contributions.

The claim that noncomplying publications are therefore

contributions is untenable. The Supreme Court has said, in

discussing related statutory provisions, that expenditures

directed by or "coordinated" with the candidate could be

treated  as  contributions, see Buckley v. Valeo, 424 U.S. 1, 46

(1976);  but  "coordination" in this context implied some measure

of  collaboration  beyond  a mere inquiry as to the position taken

by a candidate on an issue. Id. at 46-47 & n.53; see also

Colorado Republican Fed. Campaign Comm. v. FEC, 116 S. Ct.

2309, 2319 (1996) (opinion of Breyer, J.).

On its face, the FEC's voter guide regulation bars non-

written contact not merely regarding the preparation and

distribution of voter guides, but also regarding their

contents. 11 C.F.R. S 114.4(c)(5)(i), (ii)(A). Thus, the

regulation expressly prohibits a simple oral inquiry by the

-5- -5-

Maine  Committee as to a candidate's position; and the district

court  tells  us  that  the  FEC's counsel admitted at oral argument

that  the  FEC  similarly interprets its ban on "coordination" of

voting  record publications. 927 F. Supp. at 498. The FEC can

construe terms but it cannot rewrite the dictionary and

classify  a  simple  inquiry as a contribution. See Ernst & Ernst

v. Hochfelder, 425 U.S. 185, 198-99 (1976); cf. Colorado

Republican, 116 S. Ct. at 2319, 2321-22 (opinions of Breyer,

J., and Kennedy, J.).

But  if  ordinary  standards of agency power are applied, the

FEC has a stronger claim--constitutional limitations aside--

that it can on prophylactic grounds ban oral contacts for

voting records and voter guides, and perhaps require similar

amounts of coverage of candidates in voter guides. True, not

all oral contacts or different allocations of space will

involve collaboration with the candidate. But some will, and

the  FEC's  restrictions may reduce the risk of collaboration by

making  it  easier to detect and less effective where it occurs.

Normally  an  agency with rulemaking power has a measure of

latitude where it is dealing with the regulated entity (here,

corporations and unions) and where the rule is reasonably

designed to achieve the statute's goal (here, to prohibit

certain types of contributions). The FEC has such rulemaking

power. 2 U.S.C. S 437d(a)(8); Buckley, 424 U.S. at 110.

Agencies often are allowed through rulemaking to regulate

-6- -6-

beyond the express substantive directives of the statute, so

long as the statute is not contradicted. See Mourning v.

Family  Publications Serv., 411 U.S. 356, 369-71 (1973); United

States  v.  Sou thwestern Cable Co., 392 U.S. 157, 177-78 (1968);

Alexander v. Trustees of Boston Univ., 766 F.2d 630, 636-38

(1st Cir. 1985).

We think it is thus not altogether easy to avoid

approaching the question whether what the FEC is doing is

constitutional. True, one could say that it is regulating

issue advocacy while claiming to regulate contributions. But

in a sense the FEC is doing both at the same time; and the

statute,  it  should be noted, does not itself forbid reasonable

regulation of contributions that happens also to burden issue

advocacy.   As  a  statutory matter, the Act simply stops short of

prohibiting issue advocacy. Massachusetts Citizens, 479 U.S.

at 249; Faucher, 928 F.2d at 471.

Turning then to constitutional issues, we face at the

outset the claim of the Maine Committee that it has a

constitutional right of issue advocacy that is unreasonably

burdened by the regulations here at issue. In Massachusetts

Citizens, the Supreme Court not only narrowed section 441b by

construction but also recognized a First Amendment right to

issue advocacy, on behalf of a nonprofit corporation fairly

similar  to  the  Maine  Committee, that extends to the publication

of voter guides. 479 U.S. at 263. 

-7- -7-

The difficulty is that in that same case, the Supreme

Court stressed as "essential" the fact that the anti-abortion

not accept contributions from business

orporations  or  unions.   Id. at 264. This was important to the

Court  because  it  had  previously sustained the right of Congress

to limit the election influence of massed economic power in

corporate  or  union form. FEC v. National Right to Work Comm.,

 group  there  involved  did   c 459 U.S. 197, 207-10 (1982). And somewhat later, the Court

upheld a state statute that barred campaign-related issue

advocacy,  out  of  general  funds, by a nonprofit entity funded by

business  corporations.   A ustin v. Michigan Chamber of Commerce,

494 U.S. 652, 664-65 (1990).

The Maine Committee does accept contributions from other

corporations,  Clifton ,  927 F. Supp. at 494, and falls somewhere

between  the  entity  protected in Massachusetts Citizens and that

held unprotected in Austin. It is unclear what the Supreme

Court would say about the existence or extent of a

constitutiona l right of campaign-related issue advocacy (using

unsegregated funds) claimed by the Maine Committee. Nor does

the record permit us to disregard Austin on the ground that

corporate  contributions  to the Maine Committee are de minimis.1

1Despite Austin, two circuits have ruled that entities
might still obtain the protection of Massachusetts Citizens
where  business  contributions were in fact minor even though not
strictly banned by the organization. FEC v. Survival Educ.
Fund,  Inc.,  65  F.3d  285,  292 (2d Cir. 1995); Day v. Holahan, 34
F.3d 1356, 1364 (8th Cir. 1994), cert. denied, 115 S. Ct. 936
(1995). We take no view as to the correctness of these

-8- -8-

If the Maine Committee had the same constitutional right

to issue advocacy as its Massachusetts counterpart, the two

principal rules at issue might well fail under a strict-

scrutiny standard. As we will see, the limit on oral contact

and the obligation to provide equal space are significant

burdens and, as merely prophylactic rules that go beyond the

threat  (unauthorized  corporate contributions), the rules likely

would not meet the narrow tailoring requirement. FEC v.

National Conservative Political Action Comm., 470 U.S. 480,

496, 498-500 (1985). But the Court may hold that the Maine

Committee's  acceptance  of corporate contributions brings Austin

into play.

We think that the present case can be decided on grounds

that  do  not  require us to decide whether Austin applies to the

Maine Committee, an issue only the Supreme Court can resolve

definitively. For even apart from their impact on issue

advocacy, the two main FEC rules at issue curtail

constitutional rights that corporations unquestionably do

possess. Whether the curtailment goes too far as a

constitutional matter need not be decided: it is enough that

it undermines the FEC's claim of authority for its rules.

Starting with the FEC rule requiring substantially equal

space  and  prominence, we begin with the proposition that where

public issues are involved, government agencies are not

decisions.

-9- -9-

normally  empowered  to  impose and police requirements as to what

p

s

abhorrent to the First Amendment, whether the compulsion is

directed against individuals or corporations.2 And while no

case  is  an  exact match for this one, Miami Herald comes pretty

close.

There, the Supreme Court struck down Florida's "right of

reply" statute that guaranteed a political candidate equal

space  to  reply to newspaper attacks or criticism. 418 U.S. at

256. The Court said that even if no additional costs were

imposed by "compulsory access," nevertheless

[t]he  choice  of material to go into a newspaper, and
made as to limitations on the size and rivate  citizens may say or write. Commercial labeling aside, the Supreme Court has long treated compelled speech a the  decisions
content  of  the paper, and treatment of public issues
and public officials--whether fair or unfair--
constitute the exercise of editorial control and
judgment.

Id. at 258. The statute failed even though the state did not

dictate  the  content  of  the reply, nor did the newspaper purport

to  endorse  it.   Reaffirming Miami Herald, the Supreme Court not

2See McIntyre v. Ohio Elections Comm'n, 115 S. Ct. 1511,
1519-20 (1995); Hurley v. Irish-American Gay, Lesbian &
Bisexual Group of Boston, 115 S. Ct. 2338, 2347 (1995); Riley
v.  Nat'l  Fed'n of the Blind, 487 U.S. 781, 795 (1988); Pacific
Gas  &  Elec.  Co. v. Public Util. Comm'n of Cal., 475 U.S. 1, 16
(1986) (plurality opinion); Wooley v. Maynard, 430 U.S. 705,
714  (1977);  M iami Herald Publ'g Co. v. Tornillo, 418 U.S. 241,
256 (1974); West Virginia State Bd. of Educ. v. Barnette, 319
U.S. 624, 642 (1943).

-10- -10-

long ago described that case as involving a law that altered

"content." Riley, 487 U.S. at 795.

It seems to us no less obnoxious for the FEC to tell the

Maine Committee how much space it must devote in its voter

guides to the views of particular candidates. We assume a

legitimate  FEC interest in preventing disguised contributions;

but Florida's interest in fair coverage that prompted its

"right  of  reply"  statute  was hardly trivial. The point is that

the  interest  cannot  normally be secured by compelling a private

entity to express particular views or by requiring it to

provide "balance" or equal space or an opportunity to appear.

See, e.g., Hurley, 115 S. Ct. at 2347; Miami Herald, 418 U.S.

at 256.

First  Amendment concerns may be less where the government

requires balance or access than where it dictates the precise

viewpoint  to  be  expressed. But, unlike "time, place and manner"

limitations, the FEC's equal space or prominence requirement,

even if mechanically applied, does affect the content of the

Maine Committee's voting guide. Thus, the Maine Committee

could be compelled to devote substantial space to describing

the  position  of a candidate with whom it deeply disagrees. As

the Supreme Court said unanimously in Hurley, 115 S. Ct. at

2347:

this  general  rule, that the speaker has the right to
tailor the speech, applies not only to expressions
of value, opinion, or endorsement, but equally to

-11- -11-

statements of fact that the speaker would rather
avoid, McIntyre, . . . Riley . . . .

Few, if any, rights are absolute, but there is a strong

First Amendment presumption against content-affecting

government  regulation  of  private citizen speech, even where the

government  does  not  dictate the viewpoint. See Riley, 487 U.S.

at  797-98;  Pa cific Gas, 475 U.S. at 16; Miami Herald, 418 U.S.

at 256. Indeed, even for broadcasters and cable monopolies,

the Supreme Court has upheld equal coverage and "must carry"

provisions  only  because  of the unique control that broadcasters

and cable operators have over public access to programming.

Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 655-57

(1994);  Red  Lion Broadcasting Co. v. FCC, 395 U.S. 367, 392-94

(1969). That rationale has no conceivable application to the

Maine Committee.

The other rule principally at issue is the limitation on

oral contact with candidates. We think that this is patently

offensive to the First Amendment in a different aspect: it

treads heavily upon the right of citizens, individual or

corporate, to confer and discuss public matters with their

legislative  representatives or candidates for such office. As

we have explained, the regulations bar non-written contact

regarding the contents, not merely the preparation and

distribution, of voter guides and voting records; thus,

inquiries  to  candidates  and incumbents about their positions on

-12- -12-

issues  like  abortion  are  a precise target of the FEC's rules as

applied here.3 

It is hard to find direct precedent only because efforts

to  restrict  this right to communicate freely are so rare. But

we think that it is beyond reasonable belief that, to prevent

corruption or illicit coordination, the government could

prohibit voluntary discussions between citizens and their

legislators and candidates on public issues. The only

difference between such an outright ban and the FEC rule is

that the FEC permits discussion so long as both sides limit

themselves to writing. Both principle and practicality make

this an inadequate distinction.

It  is  no  business of executive branch agencies to dictate

the form in which free citizens can confer with their

legislative representatives. Further, the restriction is a

real handicap on intercourse: the nuances of positions and

votes can often be discerned only through oral discussion; as

any  courtroom  lawyer  knows, stilted written interrogatories and

answers  are  no  substitute for cross-examination. A ban on oral

communication , solely for prophylactic reasons, is not readily

defensible.

3Indeed, the chilling effect of such a restriction would
extend well beyond any discussion directed to a particular
voter guide; any inquiry by the Maine Committee to a local
representative or candidate regarding his or her position on
such issues would be vulnerable even if no mention whatever
were made of any voter guide. Cf. Riley, 487 U.S. at 794. 

-13- -13-

The Supreme Court has echoed this view, albeit in dicta.

In upholding the Attorney General's refusal to grant a

temporary visa to a foreign journalist invited to participate

in academic conferences in the United States, the Court said,

The Government also suggests that the First
Amendment is inapplicable because appellees have
free access to Mandel's ideas through his books and
speeches, and because "technological developments,"
such as tapes or telephone hook-ups, readily
supplant his physical presence. This argument
overlooks what may be particular qualities inherent
in sustained, face-to-face debate, discussion and
questioning. . . . [W]e are loath to hold on this
record that existence of other alternatives
extinguishes altogether any constitutional interest
on  the  part  of the appellees in this particular form
of access.

Kleindienst  v.  Mandel ,  408 U.S. 753, 765 (1972). See also Pell

v. Procunier, 417 U.S. 817, 825 (1974).

Such  writing-only restrictions have sometimes been upheld

in the context of commercial speech, e.g., Ohralik v. Ohio

State Bar Ass'n, 436 U.S. 447, 467 (1978) (limiting in-person

attorney  solicitation  of  clients); but the Court has never even

remotely approved such a restriction of political expression.

In  fact,  in  a companion decision to Ohralik, the Supreme Court

found such prophylactic rules unconstitutional as applied to

solicitations by nonprofit organizations offering free legal

assistance,  explaining  that the latter comprises core protected

speech and association, and that in the latter context the

First Amendment does not tolerate government regulation that

-14- -14-

might well pass muster where directed to the "conduct of

commercial affairs." In re Primus, 436 U.S. 412, 434 (1978).

With  respect  to  both  rules--the equal space and prominence

and the writing-only requirements--we readily accept that the

government has an interest in unearthing disguised

contributions.   But  the  FEC is free to investigate any instance

in which it thinks that inquiry has become collaboration;

nothing,  apart  from  conclusory allegations, has been offered by

the FEC to suggest that ordinary enforcement measures cannot

adequately  police  "secret" corporate contributions. Cf. Turner

Broadcasting, 512 U.S. at 664, 668 (plurality opinion). What

it  cannot  do--at least without direct authorization--is simply

to say that it is easier or more convenient to impair First

Amendment interests than to prove a violation by conventional

means or by more carefully tailored regulations.

The FEC might argue that it has not compelled speech or

prevented oral access in absolute terms; it has merely said

that  these  rules  apply  if a corporation wants to publish voting

records  or  voter guides using its general treasury funds. And

under  Austin ,  Congress  could constitutionally prohibit business

corporations from engaging in these activities except through

segregated  funds; possibly, the Maine Committee is in the same

position, depending on whether the Court views it as falling

under Massachusetts Citizens or under Austin.

-15- -15-

Yet  the  doctrine  of  unconstitutional conditions limits the

government's ability to make someone surrender constitutional

rights even to obtain an advantage that could otherwise be

withheld.   Se e Regan v. Taxation With Representation of Wash.,

461  U.S.  540, 545 (1983). Here, a surrender of such rights is

being required in order to do something--to publish political

information about voting guides or records--that Congress has

not made unlawful. We are not certain that Congress could

require this sacrifice based on its own judgment of need, but

the law in this realm is far from clear. Compare Rust v.

Sullivan ,  500  U.S.  173,  196-200 (1991) with O'Hare Truck Serv.,

Inc. v. City of Northlake, 116 S. Ct. 2353, 2356-57 (1996). 

Still, it is not necessary to resolve this last issue

here.   Even  if the rules are otherwise "reasonable," we do not

take Congress to have authorized rules that sacrifice First

Amendment interests. There is a long tradition of construing

statutes  narrowly to avoid constitutional issues. Indeed, the

Supreme Court took just such an approach in striking down an

NLRB  regulation  as  unauthorized without finding it necessary to

decide  the  ultimate First Amendment issue. DeBartolo Corp. v.

Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S.

568,  575-58  (1988).   Acco rd Chamber of Commerce v. FEC, 69 F.3d

600, 605 (D.C. Cir. 1995) (FEC rules).

What  we  have  said  disposes of the two main restrictions in

contention--the  equal  space and prominence requirement and oral

-16- -16-

contacts  ban--both of which appear in the regulation governing

voter  guides.   The  voting record regulation does not explicitly

contain either the requirement or the ban: it merely says

(apart from the unchallenged limitation on express advocacy)

that  "[t]he  decision on content and the distribution of voting

records shall not be coordinated with any candidate." 11

C.F.R. S 114.4(c)(4). 

But,  as  already noted, the FEC told the district judge at

oral argument that prohibited "coordination" included seeking

an explanation from the representative (for example, where

there were several apparently conflicting votes). If the FEC

does read its regulation in this fashion, it would to this

extent  raise  the same constitutional concern about access, and

reflect the same unauthorized use of rulemaking authority.

This declaration ought to satisfy the Maine Committee's

legitimate concern about misuse of the regulation.

Finally,  in  two paragraphs at the close of its brief, the

Maine  Committee  also  asserts that the voter guide regulation is

unconstitutionally vague in its dual ban on including "an

electioneering message" in a voter guide and on seeking to

"score or rate the candidates' responses in such a way as to

convey an electioneering message." 11 C.F.R.

SS 114.4(c)(5)(ii)(D), (E). This restriction applies only

where  the  entity  publishing the guide has chosen to contact the

candidate.

-17- -17-

To  our  surprise,  the  FEC  reply brief does not even pretend

to explain what the FEC means by "electioneering message";

instead the brief resorts to generalities about the tests for

unconstitutional vagueness ("no more than a reasonable degree

of certainty can be demanded"), tests mostly used in contexts

where  speech  is not involved. It then points to its "advisory

opinion  process" as a method for obtaining clarification. The

FEC also says that the Maine Committee's argument is

perfunctory. It is, but so is the FEC's reply, and the

substance of the Maine Committee's concern--vagueness--is

readily apparent.

The  FEC  might  have  argued that "electioneering message" is

simply  another  version  of the ban on express advocacy upheld by

the Supreme Court. But the FEC has conspicuously declined to

make  that  argument. Nor is it clear why, if the FEC meant the

phrase  to  be  limited  to  express advocacy, it did not simply use

those words, which are used in a different provision of the

same regulation, 11 C.F.R. S 114.4(c)(5)(i), and also in the

voting  records  regulation. We are thus entitled to assume that

"electioneering message" has a different, broader meaning.

The  district  court expressly declined to reach the issue,

927 F. Supp. at 500 n.7, apparently believing that this

restriction  could not be severed from other parts of the voter

guide  regulation that the district court had struck down. But

the  district  court opinion did not explain why and, if the FEC

-18- -18-

wants  to  assert  severability (its position is not revealed), an

argument can be made that the electioneering message ban, if

valid, can stand on its own two feet. See K Mart Corp. v.

Cartier, Inc., 486 U.S. 281, 294 (1988).

We have no intention of trying to resolve any of the

issues thus implicated, based on inadequate briefing and in

darkness as to the FEC's own position as to content, purpose

and severability. The Supreme Court's treatment of related

vagueness issues in Buckley, 424 U.S. at 40-44, and

Massachusetts Citizens, 479 U.S. at 248-49, suggests that the

vagueness attack is not frivolous, but those cases differ in

various respects from this one on the merits. And, at the

threshold, are issues of severability and ripeness.

We therefore conclude that the plaintiffs' attack on the

"electioneering  message"  provisions of the regulation should be

remanded for further proceedings in the district court. For

the same reason, we leave it to the district court to decide

whether,  in  the first instance, temporary relief against these

provisions is warranted pendente lite. Indeed, the FEC may

prefer to defer enforcement of these provisions for the time

being, if it seeks certiorari on the other issues decided

today.

Our discussion leads us to modify the district court's

judgment  as  follows: the voting record regulation, 11 C.F.R. S

114.4(c)(4), is declared invalid only insofar as the FEC may

-19- -19-

purport  to  prohibit  mere  inquiries to candidates, and the voter

guide regulation, id. S 114.4(c)(5), is declared invalid only

insofar as it limits any contact with candidates to written

inquiries  and  replies  and imposes an equal space and prominence

restriction. The validity of the "electioneering message"

provisions of the latter regulation is remanded for further

proceedings in accordance with this opinion.

It is so ordered.

Dissent follows.

-20- -20-

BOWNES, Senior Circuit Judge, dissenting. 

I dissent because I disagree with the majority's

holding that the FEC's written-contact-only regulation

infringes the First Amendment guarantee of freedom of speech.

Even where governmental regulations have "the potential for

substantially infringing the exercise of First Amendment

rights," the Supreme Court has "acknowledged that there are

governmental interests sufficiently important to outweigh the

possibility of infringement, particularly when the free

functioning  of  our  national institutions is involved." Buckley

v. Valeo, 424 U.S. 1, 66 (1976) (per curiam) (internal

quotation marks omitted). 

At  this  stage  of  American history, it should be clear

to every observer that the disproportionate influence of big

money is thwarting our freedom to choose those who govern us.

This sad truth becomes more apparent with every election. If

preventing  this  is  not  a  compelling governmental interest, I do

not know what is.

The FEC, through its voter guide regulation, has

tried to prevent such abuses, consistent with Supreme Court

precedent that protects First Amendment interests. I believe

the FEC has successfully navigated a safe path between these

competing  concerns, and has achieved a reasonable prophylactic

measure  while complying with the Court's teachings. The Court

itself  has,  over the years, grown more and more concerned with

-21- -21-

"domination of the political process" by corporate wealth.

Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 659

(1990).   I  believe the written-contact-only requirement in the

FEC's voter guide regulation fits comfortably within the

Court's guidelines because its burdens on First Amendment

freedoms are among those the Court is willing to permit in

order to achieve compelling governmental interests like those

at issue here, and the requirement is narrowly tailored to

achieve that interest.

The  majority  strikes down the FEC's written-contact-

only rule, citing virtually no authority for its position. I

recognize that the plaintiff, Maine Right to Life Committee,

Inc. (MRTLC), has articulated a First Amendment interest, but

in my view that interest is outweighed by the compelling

governmental interest in preventing corruption and corporate

domination of the political process. The majority, after

finding a First Amendment interest, fails altogether in

pursuing this next step in the appropriate First Amendment

analysis. 

I  believe  that  the  prophylactic measures contained in

the FEC's regulation are narrowly tailored to achieve the

permissible  end: they do not preclude all oral discussions of

issues between groups like MRTLC and electoral candidates, as

the majority states, see ante at 12-13 & n.3. The regulation

deals only with oral discussions relating to preparation of

-22- -22-

voter guides. Generally speaking, MRTLC is free to have all

the oral discussions that it wishes with candidates, whether

motivated by a desire to lobby, to persuade, to debate, or to

clarify. The only limitation is that MRTLC not combine its

oral "issue advocacy" with a discussion of its plans to spend

significant amounts of money to prepare and disseminate voter

guides. "[T]here is a vast difference between lobbying and

debating  public  issues  on the one hand, and political campaigns

for  election  to public office on the other." Austin, 494 U.S.

at 678 (Stevens, J., concurring). 

The  majority  has set up a straw man and then shot it

down, without reliance on any relevant authority. It has

failed to address the real issues involving this regulation,

and  to  come  to grips with the evolving Supreme Court precedent

relating to campaign finance law. I will turn to that

precedent after discussing the appropriate standard of review

that we should apply in this case.

Scope of Review

MRTLC has challenged the FEC's regulation on its

face,  not  as  applied to MRTLC itself. In attacking the facial

validity of a regulation, a plaintiff faces a "heavy burden,"

to show that the regulation can never be applied

constitutiona lly. Rust v. Sullivan, 500 U.S. 173, 183 (1991);

Members of City Council of Los Angeles v. Taxpayers for

Vincent, 466 U.S. 789, 797-98 (1984). "The fact that [the

-23- -23-

regulations] might operate unconstitutionally under some

conceivable set of circumstances is insufficient to render

[them] wholly invalid." Rust, 500 U.S. at 183 (brackets in

original) (quotation omitted). For example, in Buckley, the

Court  recognized  that  "[t]here could well be a case" where "the

Act's [disclosure] requirements cannot be constitutionally

applied," but the Court nevertheless upheld the requirements

because  none  of  the  challengers "tendered record evidence" that

such  would  actually occur; they merely stated their "fears" of

what might happen. 424 U.S. at 71. Thus, where a rule is

being challenged on its face, it would be "inappropriate" to

strike it down merely because the plaintiff can envision "an

imagined unlawful application of the rule." Massachusetts v.

United States, 856 F.2d 378, 384 (1st Cir. 1988). See also

Renne v. Geary, 501 U.S. 312, 324 (1991) (facial challenge

should generally not be entertained when an 'as-applied'

challenge could resolve the case).

The district court's determination that the FEC's

regulation is facially invalid presents a purely legal

question, and is therefore reviewable de novo. Duffy v.

Sarault, 892 F.2d 139, 145 (1st Cir. 1989). 

In reviewing agency action, if Congress has not

"directly  addressed  the  precise question at issue," a reviewing

court must defer to an agency's interpretation of the statute

it is charged with enforcing, if that interpretation is not

-24- -24-

"manifestly contrary to the statute." Chevron U.S.A. Inc. v.

Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44

(1984); Strickland v. Commissioner, Maine Dep't of Human

Servs. ,  96  F.3d 542, 545-47 (1st Cir. 1996) ("Strickland II");

Strickland v. Commissioner, Maine Dep't of Human Servs., 48

F.3d  12,  16-17 (1st Cir.), cert. denied, 116 S. Ct. 145 (1995)

("Strickland I"). A reviewing court will not "simply impose

its  own  construction"  as  to the meaning of ambiguous or unclear

statutory terms, "as would be necessary in the absence of an

administrative interpretation. Rather, if the statute is

silent or ambiguous with respect to the specific issue," and

the  agency  has furnished its interpretation, "the question for

the court is whether the agency's answer is based on a

permissible construction of the statute."4 Chevron, 467 U.S.

at 843; Strickland II, 96 F.3d at 546. The FEC "is precisely

the type of agency to which [such] deference should

presumptively be afforded." FEC v. Democratic Senatorial

Campaign Comm., 454 U.S. 27, 37 (1981).

Of course, a court will not defer to an agency's

interpretation of a statute that is directly contrary to a

prior Supreme Court interpretation of the same statutory

4. "The court need not conclude that the agency construction
was the only one it permissibly could have adopted to uphold
the construction, or even the reading the court would have
reached if the question initially had arisen in a judicial
proceeding." Chevron, 467 U.S. at 843 n.11 (citing FEC v.
Democratic Senatorial Campaign Comm., 454 U.S. 27, 39
(1981)).

-25- -25-

provision. See Faucher v. FEC, 928 F.2d 468, 471 (1st Cir.

1991). Nor will a court defer to an interpretation that is

unconstitutional. I address the First Amendment question de

novo, through the prism of the Court's teaching in this area.

The Applicable Law Governing
Campaign Finance Limitations 

The  Supreme  Court  has  observed that the "integrity of

our system of representative democracy is undermined" by

corruption. Buckley, 424 U.S. at 26-27. Although the Court

decided  a  number of cases governing campaign finance law prior

to Buckley,5 and although Buckley dealt only with individuals

and unincorporated associations and not with corporations as

plaintiff MRTLC is here, Buckley is usually viewed as the

starting point in any analysis of election law. Buckley was

also the first case to interpret the statute applicable here,

the Federal Election Campaign Act, as amended in 1974, which

significantly tightened federal election campaign financing in

the wake of the Watergate scandals.

The Court began its analysis by noting that money

spent on communication was the equivalent of speech itself.6

5. The Court has recounted some of the long prior history of
legislation regulating campaign financing in FEC v. National
Right to Work Comm., 459 U.S. 197, 208-09 (1982); Pipefitters
v. United States, 407 U.S. 385, 402-12 (1972); United States
v. Automobile Workers, 352 U.S. 567, 570-87 (1957).

6. Experience has demonstrated that Buckley may have been
too hasty in equating money with speech. Buckley began with
the premise that "[d]iscussion of public issues and debate on
the qualifications of candidates are integral to the

-26- -26-

Therefore the Court recognized that limitations on

contributions

operation of [our] system of government." 424 U.S. at 14. 

office is essential." at 14-15. "The First Amendment This is because, in a republic such as ours, "the ability of impinged upon First Amendment values in the the citizenry to make informed choices among candidates for Id.
affords the broadest protection to such political expression
in order to assure the unfettered interchange of ideas for
the bringing about of political and social changes desired by
the people." Id. at 14. Because "virtually every means of
communicating ideas in today's mass society requires the
expenditure of money," the Court in Buckley concluded that
"[a] restriction on the amount of money a person or group can
spend on political communication during a campaign
necessarily reduces the quantity of expression by restricting
the number of issues discussed, the depth of their
exploration, and the size of the audience reached." Id. at
19. 

In reality, however, Buckley's equation of money
and speech does not serve the goal of ensuring that the best
ideas emerge from a true (and fair) competition among
differing viewpoints. Rather than rewarding people or
candidates who put forward good ideas, this system rewards
people who happen to control vast amounts of money. In light
of the uneven playing field created by the unequal
distribution of income and wealth in our society, some people
can afford to purchase more of the high-cost means of speech
than can other people. The Court has recognized that
financial considerations "may make the difference between
participating and not participating in some public debate." 
See City of Ladue v. Gilleo, 512 U.S. 43, 57 (1994). Thus,
"however neutral the government's intentions in enacting a
law, the operation of that law may have a vastly uneven
impact. There is no equality in a law prohibiting both rich
and poor from sleeping under the bridges of Paris." NAACP,
Western Region v. City of Richmond, 743 F.2d 1346, 1356 (9th
Cir. 1984) (alluding to the famous aphorism of Anatole
France); see also Griffin v. Illinois, 351 U.S. 12, 23 (1956)
(Frankfurter, J., concurring) (same). Therefore, we must
carefully scrutinize even facially neutral laws if their
effects on speech "fall unevenly on different viewpoints and
groups in society." City of Richmond, 743 F.2d at 1356. And
we must avoid giving "one side of a debatable public question
an advantage in expressing its views to the people." First
Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 785-86
(1978).

-27- -27-

"uninhibited, robust, and wide-open" debate that is necessary

to enable people to make informed choices among candidates.

Buckley, 424 U.S. at 14 (quotation omitted). 

Nevertheless,  the  Court  upheld the FECA's limitations

on contributions (by individuals and unincorporated

associations) to candidates or their campaign committees.

Because our "[d]emocracy depends on a well-informed

electorate," id. at 49 n.55; see id. at 14-15, the Court

subjected  such  impingement to strict scrutiny. The Court found

that, with respect to contributions to a candidate, the

impingement was justified by the compelling governmental

interest  in  limiting  the  actuality and appearance of corruption

resulting from large financial contributions. Id. at 28-29.

Likewise,  the Court upheld limits on total contributions by an

individual, as a "modest restraint upon protected political

activity [that] serves to prevent evasion of the $1,000

contribution limitation by a person who might otherwise

contribute massive amounts of money to a particular candidate

through the use of unearmarked contributions to political

committees  likely  to  contribute to that candidate." Id. at 38.

The Court also upheld the Act's limitations on

volunteers'  incidental expenses as an acceptable accommodation

of Congress's valid interest in encouraging citizen

participation while guarding against the "corrupting potential

of large financial contributions to candidates." Id. at 36.

-28- -28-

The Court treated such incidental expenses as an in-kind

contribution,  with  the  same ultimate effect as if the money had

been contributed directly to the candidate. 

The  Buckley  Court treated limitations on independent

expenditures differently than limitations on direct

contributions to candidates. The Court realistically

recognized that those who contributed to a candidate

represented "the interests to which [the] candidate is most

likely to be responsive." Id. at 67. Nevertheless, in order

to avoid vagueness problems, the Court limited FECA's

prohibition on independent expenditures to only those

expenditures which involved express advocacy. Id. at 44. It

went  on  to  strike  down  that prohibition, even as so limited, as

violative  of  the  First  Amendment. Id. at 51. In analyzing the

First Amendment considerations, the Court stated that

expenditure limitations impose greater burdens on basic

freedoms  than do contribution limits, and do not accomplish as

much to further the goals of eliminating the potential for

abuse and quid pro quo corruption. Id. at 44-47. 

The Court's more protective approach to independent

expenditures, however, applies only to expenditures that are

"made totally independently of the candidate[s] and [their]

campaign[s]."   Id.  at  47. It found no constitutional infirmity

in FECA's treatment of "coordinated" expenditures as

contributions  and  therefore subject to FECA's limitations. Id.

-29- -29-

at 47 & n.53. Expenditures that are "coordinated" with a

candidate or his/her campaign -- which are the functional

equivalent of an in-kind contribution to the candidate -- are

treated as direct contributions to the candidate, rather than

as independent expenditures, in order to "prevent attempts to

circumvent the Act through prearranged or coordinated

expenditures  amounting  to disguised contributions." Id. at 46-

47. This is true regardless of whether the expenditure pays

for speech containing express advocacy of a candidate. Thus,

limiting such coordinated spending can "foreclose[] an avenue

of abuse." Id. at 37.

In  upholding  some burdens on First Amendment rights,

the Buckley Court recognized a compelling interest in

preventing quid pro quo corruption. It noted that, to "the

extent  that  large  contributions are given to secure a political

quid pro quo from current and potential office holders, the

integrity of our system of representative democracy is

undermined." Id. at 26-27. Moreover, "[o]f almost equal

concern as the danger of actual quid pro quo arrangements is

the  impact  of  the  appearance of corruption stemming from public

awareness of the opportunities for abuse inherent in a regime

of large individual financial contributions." Id. at 27.

Since  Buckley was decided, more evidence has come to

light demonstrating that big money can skew our democratic

election  process,  even  without a quid pro quo. Large donations

-30- -30-

from wealthy individuals, corporations and labor unions have

helped candidates accumulate considerable stockpiles of money

with which to advertise for votes. In a series of cases

beginning with FEC v. National Right to Work Comm., 459 U.S.

197 (1982) ("NRWC"), the Court has dealt with this problem in

the context of S 441b of FECA, which regulates contributions

and  expenditures  made  by  corporations and labor organizations.7

In  NRWC ,  FEC  v.  Massachusetts Citizens for Life, Inc., 479 U.S.

238  (1986)  ("Mass.  Citizens" or "MCFL"), and Austin v. Michigan

Chamber of Commerce, 494 U.S. 652 (1990), the Court has found

a compelling governmental interest in preventing corruption

even without a direct quid pro quo promise in exchange for

money. The Court has recognized that the integrity of our

electoral  system can also be undermined by a different type of

corruption: "vast reservoirs of capital" that "distort[] the

political process" and prevent it from truly reflecting the

voters'  collective evaluation of the merits of the candidates'

ideas. See Austin, 494 U.S. at 661.

The  plaintiff in National Right to Work Comm. was an

expressly ideological nonprofit association which was

incorporated  under state law, as is the plaintiff MRTLC in the

case  at  bar.   Recognizing that the FECA "reflects a legislative

7. This is to be distinguished from the sections of FECA
covered in the relevant portions of Buckley, which dealt with
contributions and expenditures made by individuals and
unincorporated groups.

-31- -31-

judgment that the special characteristics of the corporate

structure require particularly careful regulation," National

Right to Work Comm., 459 U.S. at 209-10, the Court upheld

Congress's  right  to  restrict from whom such an organization may

solicit contributions. The Court held that NRWC's

associational rights8 were overborne by the interests Congress

sought to protect in enacting S 441b, including:

to  ensure  that substantial aggregations of
wealth amassed by the special advantages
which go with the corporate form of
organization should not be converted into
political  'war chests' which could be used
to incur political debts from legislators
who are aided by the contributions.

Id. at 207. "The overriding concern behind the enactment of

statutes such as the Federal Corrupt Practices Act was the

problem of corruption of elected representatives through the

creation of political debts. The importance of the

governmental interest in preventing this occurrence has never

been doubted." National Right to Work Comm., 459 U.S. at 208

(quotations omitted) (emphasis added). As in Buckley, the

Court in NRWC recognized that it was just as important to

prevent  the  appearance  of such corrosion as the actuality. Id.

at 210. "These interests directly implicate the integrity of

our electoral process." Id. at 208 (quotation omitted).

8. Corporations as well as individuals have First Amendment
rights. First Nat'l Bank of Boston v. Bellotti, 435 U.S.
765, 784-86 (1978).

-32- -32-

Accordingly, the NRWC Court held that "the need for

a  broad  prophylactic rule," to protect against such distortion

of the political process, was "sufficient . . . to support a

limitation on the ability of a committee to raise money for

direct  contributions to candidates." Mass. Citizens, 479 U.S.

at 260.

In  Mass.  Citizens ,  the  Court shifted the focus of its

examination  from  S  441b's regulation of corporate contributions

to its regulation of corporate independent expenditures. The

Court described the "underlying rationale" for "longstanding

regulation" of corporate political activity as: 

the need to restrict "the influence of
political war chests funneled through the
corporate form," [FEC v. National
Conservative Political Action Comm., 470
U.S. 480, 501 (1985) ("NCPAC")]; to
"eliminate  the effect of aggregated wealth
on federal elections," Pipefitters [v.
United States], 407 U.S. [385,] 416
[(1972)]; to curb the political influence
of "those who exercise control over large
aggregations of capital," [United States
v.] Automobile Workers, 352 U.S. [567,]
585 [(1957)]; and to regulate the
"substantial aggregations of wealth
amassed  by  the special advantages which go
with the corporate form of organization,"
National  Right to Work Committee, 459 U.S.
at 207.

Mass. Citizens, 479 U.S. at 257. See also id. at 258-59

(Congress  added  proscription on expenditures to Federal Corrupt

Practices Act "to protect the political process from what it

deemed to be the corroding effect of money employed in

elections by aggregated power") (quotation omitted).

-33- -33-

The Court in Mass. Citizens recognized that "the

corrosive influence of concentrated corporate wealth" can

corrupt  "the  integrity of the marketplace of political ideas."

479 U.S. at 257. Regulation of corporate political activity

"has  reflected concern not about use of the corporate form per

se ,  but  about  the  potential for unfair deployment of wealth for

political purposes." Id. at 259. The Court "acknowledge[d]

the legitimacy of Congress' concern that organizations that

amass  great  wealth in the economic marketplace not gain unfair

advantage in the political marketplace." Id. at 263. This

concern  is  reflected in S 441b's "require[ment] that corporate

independent expenditures be financed through a political

committee expressly established to engage in campaign

spending," in order to "prevent this threat to the political

marketplace." Id. at 258. In order to avoid overbreadth, the

Court defined independent expenditures governed by S441b to

include only express advocacy of the election or defeat of a

candidate. Id. at 249.

The Court left open the question whether the First

Amendment  permits it to uphold S 441b's general rule -- that a

corporation must utilize a voluntary PAC rather than its

general  treasury  funds  for independent campaign expenditures as

well as for direct contributions to candidates. Instead, the

Court carved a narrow exception out of this general rule,

holding its prohibition on use of general treasury funds

-34- -34-

unconstitutional  as  applied to the narrow class of corporations

exemplified by the plaintiff in MCFL,9 even though those

corporations remained free to speak in unlimited amounts

through a separate segregated fund (as opposed to using funds

from the corporate treasury). 

To  fall  within  the  exception, a corporation must have

three  characteristics, each of which is "essential," MCFL, 479

U.S.  at  263:  First, it must be formed for the express purpose

of promoting political ideas, and cannot engage in business

activities. Second, it must have no shareholders or other

persons affiliated who would have a claim on its assets or

earnings. Third, it must not be established by a business

corporation  or labor union, nor accept contributions from such

entities. Id. at 264. The last requirement -- that the

corporation does not accept contributions from business

corporations or labor unions -- is "essential," because it

"prevents such [nonprofit ideological] corporations from

serving as conduits for the type of direct spending that

creates  a  threat  to  the  political marketplace." Id. at 263-64.

In  Austin ,  494 U.S. at 659, the Court elaborated its

"concern about corporate domination of the political process"

and decided the question left open in Mass. Citizens. The

plaintiff  in  Austin, the Chamber of Commerce, had challenged a

9. "It may be that the class of organizations affected by
[the Mass. Citizens] holding . . . will be small." Mass.
Citizens, 479 U.S. at 264.

-35- -35-

Michigan statute (similar to 2 U.S.C. S 441b) prohibiting

corporations from using treasury funds for independent

expenditures in support of a candidate. The Court found that

the  statute  burdened political speech at the core, even though

the corporation still had the opportunity to speak through

PACs.10 Despite this burden on First Amendment rights, the

Court held that the burden was justified by a compelling

governmental interest in counteracting the "corrosive and

distorting effects" of corporate wealth on the political

election process. Id. at 660. 

State  law  grants  corporations special privileges that

enhance their ability to attract capital and deploy resources

advantageousl y. These privileges include: limited liability,

perpetual  life,  and  favorable treatment of the accumulation and

distribution of assets. Id. at 658-59. These state-created

advantages enable corporations "to use 'resources amassed in

the  economic  marketplace' to obtain 'an unfair advantage in the

political marketplace.'" Id. at 659 (quoting Mass. Citizens,

479 U.S. at 257). The Court therefore has "recognized that

10. To require a corporation to use a PAC rather than
general corporate treasury funds would require it to comply
with a number of obligations it might find burdensome. For
example: PACs must designate a treasurer, keep detailed
accounts of contributions, and file a statement of
organization; PACs cannot use corporate funds at all; and
PACs may not solicit contributions except from members,
stockholders or officers. See Austin, 494 U.S. at 657
(citing Mass. Citizens, 479 U.S. at 253-54); 2 U.S.C. SS 432-
34; 441b(b)(4)(A), (C).

-36- -36-

'the  compelling governmental interest in preventing corruption

support[s] the restriction of the influence of political war

chests funneled through the corporate form.'" Id. at 659

(brackets in Austin) (quoting National Conservative PAC, 470

U.S. at 500-01). This interest reflects a "concern about

corporate domination of the political process." Id.

The Court made clear that it was not talking merely

about "financial quid pro quo" corruption. Id. at 659. It

recognized that the government has a compelling interest in

eliminating from the political process a "different type of

corruption"  as well: "the corrosive and distorting effects of

immense aggregations of wealth that are accumulated with the

help of the corporate form and that have little or no

correlation to the public's support for the corporation's

political ideas." Id. at 660; see id. at 666. It is because

the state confers on corporations legal advantages enabling

them to amass abundant "war chests" that it is not

unconstitutional for the government to limit independent

expenditures by corporations. Id. at 666.

The  Court's  holding was not limited merely to direct

contributions to candidates. "Corporate wealth can unfairly

influence elections when it is deployed in the form of

independent expenditures, just as it can when it assumes the

guise of political contributions." Id. at 660. The Austin

Court therefore held "that the State ha[d] articulated a

-37- -37-

sufficiently  compelling  rationale to support its restriction on

or  was  this   independent expenditures by corporations."11 Id. N rule specifically limited to for-profit

corporations engaged in a commercial business enterprise. As

stated,  the  rule  applied  also to nonprofit corporations, which,

after all, were the context of the case before the Court as

well as the context of National Right to Work Comm. and of

Mass. Citizens which relied on the NRWC analysis.

Our  circuit  has  also  had  occasion to weigh in on this

subject.12 Our opinion in FEC v. Massachusetts Citizens for

Life, Inc., 769 F.2d 13 (1st Cir. 1985), aff'd, 479 U.S. 238

(1986),  was  affirmed by the Supreme Court, as described supra,

but  was  essentially consistent with the Court's opinion. More

recently, this court considered a prior version of the FEC's

regulation governing voter guides. Faucher v. FEC, 928 F.2d

468 (1st Cir. 1991). The regulation itself was substantially

different from the current regulation, containing provisions

11. The Court held that the plaintiff Chamber of Commerce in
Austin did not fall within the narrow class of corporations
that Mass. Citizens exempted from this general rule. The
Court emphasized the fact that the Chamber "accepts money
from for-profit corporations" which "therefore could
circumvent the Act's restriction [on their campaign
expenditures] by funneling money through the Chamber's
general treasury" if the statutory limitations were not
applied to the Chamber. Austin, 494 U.S. at 664.

12. I do not discuss opinions of other circuits because the
precise issues here -- validity of the present regulations
governing voter guides and voting records -- have not been
decided previously by any circuit court.

-38- -38-

restricting the content of any voter guides.13 The prior

regulation  had required guides to be "nonpartisan," and listed

among  the  factors  the  FEC would consider in determining whether

a  guide  was  nonpartisan  the following: "(C) The wording of the

questions presented does not suggest or favor any position on

the  issues  covered; (D) The voter guide expresses no editorial

opinion concerning the issues presented nor does it indicate

any support for or opposition to any candidate or political

party." Id. at 470 (emphasis added in Faucher). 

We  struck  down  these  content-oriented provisions; the

speech they inhibited was protected by the First Amendment

because it was an independent expenditure that contained no

"express advocacy" of a particular candidate. We relied on

language in Buckley that had held the FECA's limits on

independent expenditures to be unconstitutional unless they

involved  "express advocacy." Id. (citing Buckley, 424 U.S. at

42-43).   We  also  relied  on a similar holding in Mass. Citizens,

479 U.S. at 249, which likewise dealt with independent

expenditures.   We  declined the FEC's invitation to defer to its

interpretation of the statute, on the ground that the Supreme

Court  had  already  spoken  directly on the precise issue that was

in  dispute.   Faucher ,  928 F.2d at 471. It is worth noting that

our decision in Faucher did not address the claim made by the

13. The majority opinion discusses the prior regulation and
the present regulation as if they were identical. See ante
at 4-5.

-39- -39-

FEC  in  the  instant case, namely, that the spending of money to

publish a voter guide after consultation or coordination with

a  candidate  regarding the preparation of the guide constitutes

the kind of coordinated expenditure that may be treated as a

contribution, not as an independent expenditure, and therefore

may be subjected to regulation.

The  latest  chapter  in  the continuing saga was written

just  last  Term. In Colorado Republican Campaign Comm. v. FEC,

116  S.  Ct.  2309,  2312  (1996) ("Colorado Republican"), the Court

struck down the FECA's limits on a political party's

expenditures in connection with a campaign, holding them

unconstitutional as applied to independent expenditures that

were made "without coordination with any candidate." It

reiterated  that the government may constitutionally set limits

on contributions, including "limits that apply both when an

individual  or  political  committee contributes money directly to

a  candidate  and also when they indirectly contribute by making

expenditures  that they coordinate with the candidate." Id. at

2313  (citing  S 441a). The "constitutionally significant fact"

in that case was "the lack of coordination between the

candidate and the source of the expenditure." Id. at 2317

(citing Buckley, 424 U.S. at 45-46). (Justice Breyer's

plurality opinion mentions "coordination" or "coordinated"

expenditures on nearly every page.) 

-40- -40-

The  Court  reversed the lower court's ruling that, as

a matter of law, a party's expenditures should be

"conclusive[ly] presum[ed]" to have been coordinated with the

eventual  candidate, even though "the record show[ed] no actual

coordination as a matter of fact" (and in fact there had been

evidence  to  the contrary). Id. at 2317-18. The three-Justice

plurality  stated that the determination of coordination with a

candidate is a factual matter, and cannot be presumed as a

matter of law. Two dissenting Justices would have upheld the

FEC's presumption and found it constitutional.

On the other hand, four Justices agreed with the

Colorado Republican Party that, due to the special role of

political  parties in our electoral system, the First Amendment

forbids congressional efforts to limit a party's coordinated

expenditures as well as independent expenditures. Those

Justices would have stricken such limitations on their face. 

This position was rejected by the majority of the

Court. The three-Justice plurality reached its conclusion on

an as-applied basis, explicitly refusing to entertain the

facial challenge. While recognizing that restrictions on

coordinated expenditures might in some circumstances unduly

infringe  on  constitutional rights, the plurality indicated that

it would uphold such restrictions in other circumstances,

depending  on  the facts of the case at hand. Id. at 2320. The

-41- -41-

two  dissenting  Justices  would have rejected both the facial and

the as-applied challenges.

As the foregoing history makes clear, the Court's

jurisprudence on campaign finance is evolving, especially with

respect  to  the use of corporate wealth in candidate elections.

The Court now recognizes that the corrosive and distorting

effect of big money to influence elections is a legitimate

governmental  concern.14 I turn now to the application of this

evolving law to the issue in contention.

Analysis 

I would hold that the FEC may constitutionally

require communications between corporations15 and candidates

regarding  voter guides to be in writing.16 While there may be

14. See David Cole, First Amendment Antitrust: The End of
Laissez-Faire in Campaign Finance, 9 Yale L. & Pol'y Rev.
236, 278 (1991) (arguing that courts cannot return to a
laissez-faire approach in the political field any more than
they would return to pre-Lochner laissez-faire in the
economic field, and therefore that courts should treat
campaign finance regulation as a legitimate exercise of the
government's First Amendment antitrust role to preserve the
marketplace of ideas). 

15. The regulation covers both corporations and labor
unions. Because MRTLC is a corporation, I will refer only to
corporations in the ensuing discussion.

16. The pertinent part of the FEC's regulation states as
follows:

(5) Voter guides. A corporation or labor
organization may prepare and distribute
to the general public voter guides
consisting of two or more candidates'
positions on campaign issues, including
voter guides obtained from a nonprofit
organization which is described in 26

-42- -42-

circumstances in which such a restriction might b

as applied, it surely survives the curren

17 The question is whether we should uphold

U.S.C. 501(c)(3) or (c)(4), provided that

paragraph (c)(5)(i) or (c)(5)(ii)(A) e unconstitutional t facial challenge.

may include in the voter guide
biographical information on each through (E) of this section. The sponsor the voter guides comply with either
candidate, such as education, employment
positions, offices held, and community
involvement.
(i) The corporation or labor organization
shall not contact or in any other way act
in cooperation, coordination, or
consultation with or at the request or
suggestion of the candidates, the
candidates' committees or agents
regarding the preparation, contents and
distribution of the voter guide, and no
portion of the voter guide may expressly
advocate the election or defeat of one or
more clearly identified candidate(s) or
candidates of any clearly identified
political party.
(ii)(A) The corporation or labor
organization shall not contact or in any
other way act in cooperation,
coordination, or consultation with or at
the request or suggestion of the
candidates, the candidates' committees or
agents regarding the preparation,
contents and distribution of the voter
guide, except that questions may be
directed in writing to the candidates
included in the voter guide and the
candidates may respond in writing.

11 C.F.R. S 114.4(c)(5)(i), (ii)(A).

17. Cf. Austin, 494 U.S. at 674 n.4 (Brennan, J.,
concurring) (The "central lesson of MCFL [is] that the First
Amendment may require exemptions, on an as-applied basis,
from expenditure restrictions" if the organization exhibits
all three of the required characteristics.) (emphasis added).

-43- -43-

the FEC's characterization of MRTLC's contact with candidates

as  a  coordinated expenditure which, under the FECA, is treated

as a contribution and therefore may be regulated. Even with

respect to individuals, Buckley created two categories of

campaign  spending  which  are to be treated differently. For the

most  part,  limits on contributions made to candidates or their

campaigns are constitutional; limits on totally independent

expenditures  are not (i.e., expenditures "not coordinated with

the  candidate or candidate's campaign"). Colorado Republican,

116 S. Ct. at 2313 (citing Buckley, 424 U.S. at 39-51).

Expenditures  that are coordinated with the candidate

or candidate's campaign, even if not contributed directly to

the  candidate, are "treated as contributions," and they can be

regulated  just as if they were direct contributions. Buckley,

424  U.S.  at  46  &  n.53;  Co lorado Republican, 116 S. Ct. at 2313.

That is, to be treated as independent, rather than as a

contribution, an expenditure must be "totally independent[]."

Buckley, 424 U.S. at 47. Since this is true for individuals

and unincorporated organizations like political parties, it

should be at least as true for corporations whose "vast

reservoirs of capital," Austin, 494 U.S. at 661, pose more of

a  threat  to  "the integrity of our electoral process," National

Right to Work Comm., 459 U.S. at 208 (quotation omitted), and

therefore "require[] particularly careful regulation," id. at

209-10.

-44- -44-

The expenditure in this case occupies a middle

ground: MRTLC's spending on voter guides is not contributed

directly to candidates but is not totally independent either.

It  is  coordinated  with  the candidate to some degree. MRTLC may

be correct that this is not exactly identical to the

coordination that exists when an organization buys $20,000

worth of food for a campaign rally, but it does entail some

aspects  of  what is ordinarily thought of as coordination. See

Random House Dictionary of the English Language 447 (2d ed.

1987) ("act[ing] in harmonious combination"). And, as I will

discuss shortly, it poses some of the same kinds of danger of

corruption and distortion of the election process. With this

in-between  level of coordination, the question here is whether

the  degree  of coordination between MRTLC and the candidates in

preparing the voter guides is sufficient to treat the money

spent to produce and distribute the guides as a contribution

and therefore regulable, taking into account constitutional

requirements. See Colorado Republican, 116 S. Ct. at 2320.

I agree with the majority that the constitutional

issue  cannot  be avoided by resort to statutory interpretation.

The  district  court  was  mistaken to conclude that the FEC has no

authority to interpret S 441b as it has, simply because the

statute does not contain a provision specifically authorizing

this particular interpretation. The Act generally empowers

(indeed,  requires) the FEC to promulgate rules and regulations

-45- -45-

"to carry out the provisions of [the] Act," 2 U.S.C. S 438

(a)(8); see also 2 U.S.C. S 437d (a)(8), including

"formulat[ing] policy with respect to" the Act. 2 U.S.C. S

437c(b)(1). It is entirely appropriate for an agency to fill

in  the  interstices in an ambiguous or incomplete statute. See

Chevron ,  467  U.S. at 843-44; Strickland I, 48 F.3d at 21 (when

statute is subject to more than one possible interpretation,

"it is up to the [agency], not the courts, to balance the

relevant  policy  considerations and formulate a rule"). Neither

Congress  nor  the Court has specifically addressed the question

of what degree of coordination is required before an

expenditure may be treated as a contribution under the FECA. 

Therefore a reviewing court should defer to the

agency's interpretation as long as it is not "manifestly

contrary to the statute," which cannot be said of the

regulation at issue here. See id. at 844; Strickland II, 96

F.3d at 547 ("court must avoid inserting its own policy

considerations into the mix"). Looking to other parts of the

FECA  for  guidance,  according to the general definitions section

of  the  Act,  2  U.S.C.  S  431(17), an expenditure by a corporation

that  is  made  in "cooperation or consultation" with a candidate

does not qualify as an "independent expenditure." It would

therefore  be  treated as an indirect contribution under S 441b,

as  interpreted in Buckley, 424 U.S. at 46 & n.53, and Colorado

Republican ,  116  S.  Ct.  at 2313. In addition, another provision

-46- -46-

of the Act explicitly states that, for purposes of subsection

441a(a), "expenditures made by any person in cooperation,

consultation,  or  concert, with, or at the request or suggestion

of,  a  candidate, his authorized political committees, or their

agents, shall be considered to be a contribution to such

candidate." 2 U.S.C. S 441a(a)(7)(B)(i) (emphasis added).

This provision makes explicit Congress's intention that

coordinated expenditures like those here -- spending on voter

guides that were prepared after consultation and cooperation

with candidates -- be considered contributions, at least for

purposes of S 441a.

"[T]here is a presumption that a given term is used

to mean the same thing throughout a statute." Brown v.

Gardner, 513 U.S. 115, 118 (1994). In light of this canon of

statutory  construction,  and because nothing in S 441b specifies

a  different  view  of  the  term "contribution," I see no reason to

second-guess the FEC's interpretation that expenditures on

voter guides, the preparation of which is coordinated with

candidates,  should be treated as contributions under S 441b as

well as under S 441a. See Chevron, 467 U.S. at 844. I turn

now  to  the  question  whether the statute is constitutional as so

interpreted. 

As already noted, plaintiff MRTLC challenges the

FEC's interpretation on its face, not as-applied. With an

-47- -47-

exception  not applicable here,18 in order to prevail on such a

challenge, the plaintiff must show that the regulation can

never be applied constitutionally. Rust, 500 U.S. at 183.

This the plaintiff cannot do: MRTLC itself exemplifies an

organization to which the written-contact-only regulation, 11

C.F.R. S 114.4(c)(5)(ii)(A), may constitutionally be applied.

MRTLC's  expenditure on voter guides is not totally independent

of the candidates, which would be necessary to be entitled to

the full protection of Buckley and its progeny. It is a

coordinated expenditure that is legitimately treated as if it

were a contribution and, as such, may be regulated by the FEC

under FECA, at least by means of this limited prophylactic

measure  requiring  that  MRTLC's contacts with candidates be only

in writing.

"When deciding whether a[n] . . . election law

violates First and Fourteenth Amendment associational rights,

we weigh the character and magnitude of the burden the . . .

18. An alternative way for the plaintiff to prevail on a
facial attack would be to demonstrate that, even though the
challenged law "may be validly applied to the plaintiff and
others, it nevertheless is so broad that it may inhibit the
constitutionally protected speech of third parties." New
York State Club Ass'n, Inc. v. New York City, 487 U.S. 1, 11
(1988) (quotation omitted). A facial overbreadth challenge
is "an exception to ordinary standing requirements" and "will
not succeed unless the statute is substantially overbroad,
which requires the court to find a realistic danger that the
statute itself will significantly compromise recognized First
Amendment protections of parties not before the Court." Id.
(quotation omitted). In the instant case, MRTLC's brief does
not begin to meet its burden in this respect.

-48- -48-

rule imposes on those rights against the interests the

[government] contends justify that burden, and consider the

extent to which the [government's] concerns make the burden

necessary."   Timmons v. Twin Cities Area New Party, 117 S. Ct.

1364, 1370 (1997) (internal quotation marks omitted).

As in Buckley and Austin, when an expenditure is

coordinated with a candidate, it may be treated as a

contribution, in part because in both situations the burden on

constitutional rights is less than would be the case for a

totally independent expenditure. Buckley found contribution

limits to be "only a marginal restriction upon the

contributor's  ability  to  engage in free communication," because

"the transformation of contributions into political debate

involves speech by someone other than the contributor." 424

U.S. at 20 (emphasis added). 

Similarly  in  the case at bar, to the extent MRTLC is

seeking  merely to distribute a purportedly accurate reflection

of  the  candid ates' views on the issues, distributing the voter

guides  is  more  like  helping certain candidates to express their

views through a contribution, as distinguished from the

organization's expressing its views. The burden on MRTLC's

First Amendment rights is therefore less than it would be if

the  voter  guides  purported to represent MRTLC's own views. See

id.

-49- -49-

In addition, as Justice Brennan, one of the Supreme

Court's great champions of First Amendment rights to free

speech and association, noted in his concurrence in Austin,

even  the  greater  restrictions approved by the Court there would

not  impose  an excessive burden on a corporation because it was

allowed to speak through PACs, even if not through general

treasury funds. Austin, 494 U.S. at 669 n.1, 671 n.2. He

listed "many avenues of communication" still open to the

plaintiff there (the Chamber of Commerce), which showed that

"the segregated fund requirement in practice has not burdened

significantly the Chamber's speech." Id. at 676 n.7; see

Timmons, 117 S. Ct. at 1371. "[T]here is a vast difference

between lobbying and debating public issues on the one hand,

and political campaigns for election to public office on the

other." Austin, 494 U.S. at 678 (Stevens, J., concurring).

The burden on MRTLC's constitutional rights here is

even less intrusive. The regulation's requirement that any

contact with candidates be in writing is itself a relatively

minor restriction, more analogous to the disclosure

requirements upheld in Buckley than to Austin's limitation on

independent expenditures which the Court nevertheless upheld,

although acknowledging that it would impose a heavy burden on

First  Amendment  rights.   The written-contact-only rule does not

impose even as much burden on First Amendment rights as the

limitations on contributions upheld in Buckley. In contrast

-50- -50-

to  the  limitations  upheld in Buckley and Austin on the absolute

amount of money spent, in the case at bar the type of

restriction imposed by the FEC's written-contact-only

regulation  does  not  limit the quantity of speech in any way; it

simply specifies the manner in which the corporation consults

with candidates in preparing its voter guides. Thus, the

regulation is significantly less intrusive on MRTLC's First

Amendment  rights than those absolute limits on the quantity of

speech.19 

The writing requirement is also content-neutral (in

both purpose and effect): it does not prefer any one message

over another in MRTLC's voter guides, as long as the guides

were prepared without any oral contact with the candidates.

The rule is completely indifferent to the issues the

corporation wishes to address in its voter guides and to the

positions the corporation itself takes on those issues. In

addition, MRTLC may say anything it wants to a candidate (or

ask any questions it wants) during the preparation of the

19. The Court recently rejected a claim based upon what
appears to me to be a much more intrusive burden. Timmons,
117 S. Ct. at 1372. Because the "independent expression of a
political party's views is core First Amendment activity,"
id. at 1369 (internal quotation marks omitted), a political
party had claimed that the state's ban on fusion candidates
unconstitutionally burdened the party's right to communicate,
in that the ban prevented the party from "using the ballot to
communicate to the public that it supports a particular
candidate" and the ban "shut[] off one possible avenue a
party might use to send a message to its preferred
candidate." Id. at 1372. The Court rejected the claim and
upheld the ban. Id.

-51- -51-

guides,  as  long as it does so in writing. The regulation does

not limit the content of the communication between MRTLC and

the candidates, only the manner (written or non-written) in

which such communication is effectuated.20 

Moreover, as in Austin, the written-contact-only

regulation applies only to the organization's use of general

treasury funds; it does not apply at all to PAC money from a

separate  segregated  fund. If MRTLC were willing to comply with

the  reporting and other requirements by which the FEC monitors

ordinary  corporate PACs, then it would not have to comply with

the challenged restriction.21 In addition, the written-

contact-only  rule does not apply at all to totally independent

issue advocacy to the public, upon which Austin permitted

restrictions. If MRTLC engaged in no consultation with the

candidates  at all, it could publish voter guides, even pay for

them  out  of  its  general  corporate treasury, advocating whatever

position it wanted to, on any issue, as long as it did not

expressly advocate the election or defeat of a clearly

20. Other portions of the voter guide regulation, S
114.4(c)(5)(ii)(B)-(E), do contain restrictions on contents -
- forbidding guides that devote more prominence to one
candidate than another or that contain an electioneering
message. The written-contact-only rule, S
114.4(c)(5)(ii)(A), however, does not contain content-based
requirements.

21. Corporations may use general treasury funds (as well as
PAC funds) to finance communications with their members,
stockholders, and executive and administrative personnel, on
any subject. 2 U.S.C. S 431(9)(B)(iii).

-52- -52-

identified candidate. Thus, the burden on First Amendment

rights  posed  by the challenged regulation is relatively small.

Even where governmental regulations have "the

potential for substantially infringing the exercise of First

Amendment rights," the Court has "acknowledged that there are

governmental interests sufficiently important to outweigh the

possibility of infringement, particularly when the free

functioning of our national institutions is involved."

Buckley ,  424  U.S.  at  66  (internal quotation marks omitted); see

Timmons, 117 S. Ct. at 1369 ("'[A]s a practical matter, there

must  be  a  substantial  regulation of elections if they are to be

fair and honest and if some sort of order, rather than chaos,

is  to  accompany the democratic process.'") (quoting Burdick v.

Takushi, 504 U.S. 428, 433 (1992)). The Court has repeatedly

held that burdens on First Amendment rights more significant

than  those  involved in the instant case were outweighed by the

potential for corruption, Buckley, and by the corrosive and

distorting effects of corporate wealth, Austin. Cf. Burdick,

504  U.S.  at  434 ("[T]he rigorousness of [the] inquiry into the

propriety of a state election law depends upon the extent to

which a challenged regulation burdens First and Fourteenth

Amendment  rights.");  Werm e v. Merrill, 84 F.3d 479, 483-84 (1st

Cir. 1996).

Moreover, as the Court said in Mass. Citizens,

"restrictions on contributions require less compelling

-53- -53-

justification than restrictions on independent spending.

MCFL

was required, "the need for a broad prophylactic " , 479 U.S. at 259-60 (emphasis added). Because less of a justification

rule was thus sufficient . . . to support a limitation on the

ability  of  a  committee to raise money for direct contributions

to candidates."22 Id. at 260. 

In Austin, the Court went further; it upheld a rule

restricting  a nonprofit corporation's independent expenditures

as well as contributions, justified by the fact that all

corporations  both "receive from the State the special benefits

conferred  by  the corporate structure and present the potential

for distorting the political process." 494 U.S. at 661; see

id. at 663 n.2 (recognizing "the possible distortion of the

political process inherent in independent expenditures from

general  corporate funds") (emphasis added). Because the Court

found  that  "[c]orporate  wealth can unfairly influence elections

when it is deployed in the form of independent expenditures,

just as it can when it assumes the guise of political

22. The Court was not troubled by the fact that a
prophylactic rule might sweep broadly, restricting
corporations with less money as well as those with
substantial war chests. Austin, 494 U.S. at 661. Because it
is the "potential" for big money to have an unfair influence
that "demands regulation," the Court would not "second guess
a legislative determination as to the need for prophylactic
measures where corruption is the evil feared." National
Right to Work Comm., 459 U.S. at 210. See also Buckley, 424
U.S. at 84 (upholding disclosure rules that required even
law-abiding PACs to keep records of independent expenditures
as a prophylactic measure necessary for the FEC to be able to
enforce the law's other requirements effectively).

-54- -54-

contributions,"  id.  at  660, the Court concluded that preventing

"corporate domination of the political process" was a

sufficiently compelling interest to justify the burdens on a

nonprofit corporation's First Amendment rights, even in the

context of totally independent expenditures. Id. at 659. 

Surely, then, the same concerns are sufficiently

compelling where, as here, corporate wealth is deployed in an

in-between  form,  i.e.,  spending that is not totally independent

but rather entails some degree of coordination with the

candidates.   The majority protects the freedom of corporations

to meet face-to-face with a candidate, in order to secretly

plan the content and presentation of voter guides that the

corporation will distribute to the public. I believe this

concern  should be secondary to protecting the integrity of our

electoral process. See Buckley, 424 U.S. at 66. The

government has a compelling interest in taking prophylactic

measures to prevent the coercion and corruption that would

arise if a corporation like MRTLC offered to provide valuable

in-kind  assistance  (providing expensive advertising for free)23

to a candidate on the condition that the candidate take the

23. The candidate does not have to pay for publishing the
"voter guide," which can nevertheless greatly benefit his or
her campaign: the guide will highlight the candidate's pro-
life position (or the pro-choice position of his or her
opponent) and will be mailed to voters who presumably share
MRTLC's views on this issue. This could save the candidate a
considerable sum to publicize his or her positions in a
favorable light to a targeted group of voters to whom this
issue is particularly important. 

-55- -55-

position  the  corporation  demands, and to prevent the appearance

FEC regulation prohibiting unwritten contact wit

d of such coercion or corruption.  The FEC is legitimately concerned about the danger. The h candidates was designed to foreclose the abuse that coul

potentially arise from a corporation like MRTLC pressuring a

candidate  to  amend his or her position on an issue, on pain of

losing this kind of substantial in-kind contribution.24

According to the FEC, a prophylactic rule is needed so

corporations do not induce candidates to change positions

merely  because they need the money to finance their campaigns,

even if they do not actually agree with the change. If the

question were the FEC's authority to regulate an organization

offering a $20,000 cash contribution to a candidate if she

would agree to change her position to one of support for the

organization's position on a particular piece of legislation,

there would be no question of the FEC's authority to regulate

the  organization.   I  see  no reason why the result should not be

24. Prior to Buckley, when contributors could give money to
a campaign either through direct contributions or independent
expenditures, they usually chose the direct route. But since
the Buckley decision, which foreclosed that route (for
expenditures beyond certain limits), they have had to find
other ways to financially benefit the candidate's campaign by
giving independently. "It would naively underestimate the
ingenuity and resourcefulness of persons and groups desiring
to buy influence to believe that they would have much
difficulty devising expenditures that skirted the restriction
on express advocacy of election or defeat but nevertheless
benefited the candidate's campaign." Buckley, 424 U.S. at 45.

-56- -56-

the same if the organization offers instead $20,000 worth of

pamphlets presenting the candidate's view on this issue in a

favorable, rather than an unfavorable, light. 

Consider the following scenario. An organization

consults with a candidate regarding his or her plans or needs

in the campaign, and then says to the candidate: "You have

stated  the  position you believe in, but we disagree with it in

certain respects. We plan to spend $20,000 to print voter

guides  and  distribute them largely to persons in sympathy with

our views. If you modify your position to be more like ours,

our  voter  guides  will  tell people that you support our position

and  your  opponent does not. If you don't modify your stand as

we  suggest,  we  will  spend the money on voter guides which paint

you in an unfavorable light." 

The  prophylactic measure required by the FEC rule is

simply that discussions with candidates about the preparation

of voter guides be in writing, and not oral. Non-written

communications with candidates about voter guides present an

opportunity  for  the  kind  of dangerous quid pro quo at the heart

of the compelling justification that the Supreme Court has

repeatedly relied upon in upholding the Act's restrictions on

contributions and coordinated expenditures. "[I]n-person

solicitation  may exert pressure and often demands an immediate

response, without providing an opportunity for comparison or

reflection." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447,

-57- -57-

457  (1978).   Unlike  a  written communication, an oral discussion

"is not visible or otherwise open to public scrutiny. Often

there is no witness other than the [parties to the

conversation], rendering it difficult or impossible to obtain

reliable proof of what actually took place." Id. at 466.

Under the majority's position sustaining MRTLC's view,

corporate  voter guides "would be virtually immune to effective

oversight and regulation."25 Id. I agree with the FEC that

the written-contact-only requirement "eliminates the

possibility of unrecorded conversations that could entice or

coerce a candidate to alter his or her positions in exchange

for favorable treatment in a voting guide." FEC Brief at 31.

Such coercion exemplifies the kind of distortion of our

political process with "immense aggregations of wealth" of

which  Austin , 494 U.S. at 660, and Mass. Citizens, 479 U.S. at

263, would disapprove, and which the FEC may regulate with

prophylactic measures like its written-contact-only

requirement. I conclude that "[i]t therefore is not

unreasonable, or violative of the Constitution, for [the FEC]

to respond with what in effect is a prophylactic rule."

Ohralik, 436 U.S. at 467.

25. The district court itself was "sympathetic to the
argument that enforcement is more difficult if the FEC cannot
prohibit all oral communications and make enforcement
decisions on simple criteria easily applied to written
questions and answers." 927 F. Supp. at 500. 

-58- -58-

The plaintiff relies heavily on Mass. Citizen

"), 479 U.S. at 263-64, which emphasized the difference s ("MCFL

between the type of corporation before the Court there and an

ordinary, business-oriented corporation whose independent

expenditures (even if not coordinated with a candidate to the

extent these voter guides are) may be restricted without

violating  the First Amendment.26 Austin, 494 U.S. at 660. It

is true that MCFL exempts from FECA's general rule a "small"

group  of  corporations that do not pose the same kind of threat

to the electoral process, MCFL, 479 U.S. at 263-64, because

they do not have access to "vast reservoirs" of corporate

wealth (among other factors), Austin, 494 U.S. at 661, 664.

But  the  significant  fact  in MCFL was not that the plaintiff was

a nonprofit ideological corporation: indeed, in Austin, the

Court upheld the constitutionality of regulations restricting

independent expenditures by a nonprofit ideological

corporation. Id. at 659-60.

Just as in Austin, the instant case is

distinguishab le from MCFL. In Austin, "the Constitution [did]

not  require  that  [the  plaintiff] be exempted from the generally

applicable  provisions" of the campaign finance law, because it

"[did] not share [the three] crucial features" that justified

26. It is significant that the holding in MCFL was limited
to an as applied analysis of the facts pertaining to the
plaintiff before the Court. It did not extend to a facial
challenge as the instant case purports to be.

-59- -59-

the narrow MCFL exception. Austin, 494 U.S. at 662. In the

instant case, MRTLC accepts contributions from for-profit

business  corporations and intends to continue doing so. MRTLC

does not eschew those "vast reservoirs of capital." Austin,

494 U.S. at 661. This is the point on which the Chamber of

Commerce in Austin differed "most greatly" from the plaintiff

in Mass. Citizens. Austin, 494 U.S. at 664. The source of

MRTLC's  funds  creates  the potential that MRTLC will "serv[e] as

[a] condui[t] for the type of direct spending that creates a

threat to the political marketplace." Id. at 664 (quoting

Mass. Citizens, 479 U.S. at 264) (brackets in Austin). This

would enable for-profit business corporations -- themselves

"barred  from  making  independent expenditures directly," Austin,

494  U.S.  at  673-74 (Brennan, J., concurring) -- to "circumvent

the Act's restriction [on corporate financing of election

campaigns] by funneling money through [MRTLC's] general

treasury." Austin, 494 U.S. at 664. Cf. California Medical

Ass'n v. FEC, 453 U.S. 182, 197-99 (1981) (plurality opinion)

(danger of evasion of limits on contribution to candidates

justified prophylactic limitation on contributions to PACs).

Finally, the FEC's written-contact-only rule for

preparing voter guides is narrowly tailored to address the

governmental  interest  here. It does not stop corporations like

MRTLC from communicating their views about abortion or about

particular  candidates  to  the public; nor does it stop them from

-60- -60-

communicating with candidates to lobby them to change their

positions, as long as the lobbying is not done in the context

of offering what could be the functional equivalent of an

extremely  valuable in-kind contribution; it does not even stop

them from communicating with candidates to gain information

about  candidate  positions to include in the corporation's voter

guide.   All  it  does  is  require the latter type of communication

directly with candidates to be done in writing, for

prophylactic reasons. I agree with the FEC that, in the

context of this case, "oral conversations, unlike written

questions,  inherently  provide an opportunity for prearrangement

and coordination, while adding little or no additional

information  necessary  to  produce a voting guide." FEC Brief at

33.

In Austin, the Court found that a statute was

"precisely targeted to eliminate the distortion caused by

corporate  spending while also allowing corporations to express

their  political  views,"  where the statute permitted independent

political expenditures through PACs but forbade such

expenditures from general corporate treasury funds. 494 U.S.

at 660. The Court concluded that the statute was not

overinclusive merely because it imposed the same restrictions

on small companies that did not "possess vast reservoirs of

capital."   Id . at 661. The Court noted that National Right to

Work Comm. had rejected a similar overinclusion argument,

-61- -61-

because "it is the potential for such influence that demands

regulation." Id. (quotation omitted). The written-contact-

only regulation is likewise sufficiently narrowly tailored.

I  conclude  that the FEC may construe a corporation's

contact  with  candidates in the preparation of a voter guide as

"coordination" with the candidates. Therefore the FEC may

treat  the  expenditure of money on those voter guides as an in-

kind  contribution  to  the  candidates. In this context, the need

for a prophylactic rule is sufficient to justify the limited

restriction imposed by the written-contact-only regulation.

I am mindful that MRTLC's challenge here is facial,

not  as-applied.   MRTLC  is not asking us to consider whether the

written-contact-only  rule is unconstitutional as applied to it.

Therefore,  I  do not consider whether, if a full factual record

were before us, MRTLC might be able to show that it is not in

fact a conduit for corporate wealth. Thus, even if the

regulation would be unconstitutional as applied to someone, a

facial  challenge like the present one must fail where even the

plaintiff appears to exemplify a situation where the written-

contact-only regulation may constitutionally be applied. Cf.

Austin, 494 U.S. at 674 n.4 (Brennan, J., concurring).

Conclusion

I  believe  that the majority has misstated the thrust

of  the  FEC's  written-contact-only regulation. The issue is not

as simple nor as amenable to broad-brushed analysis as the

-62- -62-

majority thinks. It cannot be resolved without examining the

evolution of Supreme Court case law, which the majority has

ignored. Because, as I read the case law, we should uphold

this prophylactic regulation, I respectfully dissent.

-63- -63-